[No. B120350. Second Dist., Div. Four. Oct. 13, 1999.]

FRANCIS EGBULE IWEKAOGWU, Plaintiff and Respondent, v.
CITY OF LOS ANGELES, Defendant and Appellant.

804

**COUNSEL**

James K. Hahn, City Attorney, Winston F. Tyler, Richard M. Helgeson and Catharine H. Vale, Assistant City Attorneys, for Defendant and Appellant.

Law Offices of Leo James Terrell and Leo James Terrell for Plaintiff and Respondent.

## OPINION

**KUHL, J.**\*—Francis Egbule Iwekaogwu (Iwekaogwu) was employed as an engineer in the harbor department of the City of Los Angeles (City). While employed there Iwekaogwu, an African-American from Nigeria, complained that he was subjected to discriminatory treatment on the basis of his race and national origin. Eventually he brought this action against the City, alleging claims under the California Fair Employment and Housing Act, Government Code section 12900 et seq., for discrimination on the basis of race and national origin, hostile work environment, and retaliation. The jury found in favor of Iwekaogwu on his retaliation claim but was unable to reach a verdict on the other theories of liability. The jury awarded damages in the amount of $775,000.

The City filed posttrial motions arguing that there was insufficient evidence to support the verdict and that a new trial should be granted on grounds of jury misconduct and excessive damages. The court rejected the City's contentions concerning sufficiency of the evidence and jury misconduct. The court denied the City's motion for a new trial on damages, conditioned on the plaintiff's accepting a remittitur reducing the jury's verdict to $500,000. Iwekaogwu accepted the remittitur and judgment was entered for the plaintiff in the amount of $500,000. The City filed this appeal, reasserting the arguments made in its posttrial motions. We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Because all reasonable inferences must be drawn in favor of the judgment below, we describe the facts in the light most favorable to Iwekaogwu.

Iwekaogwu is an African-American male. His national origin is Nigerian. He has two masters degrees in civil engineering.

Iwekaogwu was hired by the City Department of Public Works in July 1988. In December 1989 he was hired by the harbor department of the department of public works as a civil engineering assistant II. He was hired for the structural design section, a small unit of approximately six engineers. Iwekaogwu was the first African-American to join the structural design section of the harbor department.

During Iwekaogwu's interview with the harbor department, one of the interviewers asked him whether he had ever been harassed on the job before.

---

\*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of California Constitution.

The interviewer told Iwekaogwu that he should "get prepared because there [are] a lot of them in the Harbor Department."

After Iwekaogwu was hired, Max Weismair was his immediate supervisor. At the end of 1990 Weismair gave Iwekaogwu an evaluation, giving him the highest possible rating in all categories. The evaluation also was signed by Larry Anderson, Weismair's supervisor.

Iwekaogwu took and passed an examination to become a civil engineer associate. When the list of those who had passed the examination was published in 1991, Iwekaogwu approached Weismair about a promotion to the position of civil engineer associate. Weismair told Iwekaogwu that he would discuss the issue with Larry Anderson. Later Weismair told Iwekaogwu that Anderson had said that the harbor department was not a place for Iwekaogwu to continue his professional career and that if he needed any promotional opportunity he should seek it elsewhere. As of that time Iwekaogwu had not had any professional contact with Anderson.

After this incident, in a conversation with Doug Thiessen in 1991, Iwekaogwu threatened to file a race discrimination action against the harbor department. Thiessen at that time was not a member of the structural design section of the harbor department. However, Iwekaogwu testified that Thiessen went to Adam Birkenbach and Vernon Hall to discuss the matter.[1] Birkenbach was Anderson's supervisor and Hall was Birkenbach's supervisor.

In August 1991 Iwekaogwu was promoted to the position of civil engineer associate. However, when promotions for the period from July 1991 to early 1992 were announced at a general meeting in early 1992, Iwekaogwu's promotion to civil engineer associate was not announced.

In October 1992 and May 1993 Weismair again gave Iwekaogwu the highest rating on his job evaluations.

In 1993 Iwekaogwu took an examination for the position of structural engineering associate I. He had the highest score of all the candidates in the harbor department on the examination and was ranked eighth in the City overall. Iwekaogwu also took and passed the examination for the position of civil engineer. He never was notified that he was eligible to apply for a position as civil engineer on the basis of his test scores. However, in 1993 the construction management division of the harbor department promoted a White male to the position of civil engineer in that division, even though that person had failed the civil engineer examination that Iwekaogwu had passed.

---

[1]There was no objection to this testimony by Iwekaogwu concerning what Thiessen did.

Raymond Aliviado became Iwekaogwu's supervisor in late 1993. Prior to that time Aliviado had been one of Iwekaogwu's coworkers in the structural design section. Aliviado had begun keeping a diary with comments about Iwekaogwu's work in 1991, when they were coworkers. Aliviado continued keeping notes about Iwekaogwu after he became Iwekaogwu's supervisor. Iwekaogwu was the only employee about whom Aliviado kept notes.

On or about April 18, 1994, Iwekaogwu spoke to Bob Zmuda (who was second in command of the section under Aliviado) about Iwekaogwu's interest in a promotion to the position of structural engineering associate. Zmuda spoke with Aliviado and then told Iwekaogwu that Aliviado had said he was waiting to fill the existing structural associate position with the civil associate. Zmuda also told Iwekaogwu that Aliviado had said that Iwekaogwu was doing an unsatisfactory job, but that Zmuda had worked with Iwekaogwu on a lot of projects and found him very competent.

Slightly more than a week after Iwekaogwu inquired about a promotion, Aliviado gave Iwekaogwu a job evaluation, rating him as unsatisfactory overall. The evaluation included comments that Iwekaogwu needed to listen to and follow instructions more carefully, to be more careful in checking his work, to better interpret engineering drawings, and to take initiative and ask more questions.

Iwekaogwu then wrote a letter to Ezunial Burts, the executive director of the harbor department. He delivered it by hand to a secretary in the executive director's office in early May 1994.[2] Burts testified that he did not see the letter until after litigation was commenced, but that the letter was referred to Hall who in turn assigned it to Anderson for follow-up.

Iwekaogwu's letter was captioned "Discrimination Complaint in Engineering Division of the Harbor Department of the City of Los Angeles." After reciting Iwekaogwu's history of employment in the harbor department, the letter complained about the employment evaluation from Aliviado; hostile actions by Aliviado toward Iwekaogwu, including his yelling at Iwekaogwu in front of coworkers; the failure to announce his promotion in 1991; and other actions. Iwekaogwu described these as "instances where I have been discriminated against." The letter states: "I honestly feel that I have suffered more than enough reprisals for humbly requesting for a promotion, just as others did, in 1991." It concludes by stating: "I strongly feel that Mr. Ray Aliviado is not acting within his professional and city rules and regulations. Rather he is relying on his personal prejudices to make

[2]The letter bears the date May 2, 1992. However it discusses events that occurred through late April 1994. It bears a date stamp of May 4, 1994.

professional judgements [*sic*]. He is not acting alone. He is receiving advice from somewhere and I will appreciate a full fledged investigation."

On May 16, 1994, Iwekaogwu had a meeting with Anderson concerning Iwekaogwu's letter to Burts. Anderson said that he would speak with Birkenbach to discuss the letter and that he would get back to Iwekaogwu in a week. Anderson asserted that there was no discrimination in the harbor department and that it was not possible for Aliviado to discriminate against Iwekaogwu. Anderson asked if Iwekaogwu had heard about the Ku Klux Klan, Neo Nazis and Skinheads rising up all over the United States and Europe. Anderson said "that is racial discrimination" and there was no discrimination in the harbor department. Anderson also told Iwekaogwu that as long as he remained in the harbor department he should not expect any promotions. Anderson did not follow up with Iwekaogwu after this meeting. However, after the meeting, Aliviado no longer supervised Iwekaogwu.

In May 1994 Zmuda replaced Aliviado as supervisor in the structural design section. In October 1994 Zmuda selected Angel Lim to be the structural engineering associate for the structural design section. Lim was transferred from the construction management section. Lim had taken the structural engineering examination and had scored lower on it than Iwekaogwu. Aliviado told Zmuda that Lim would be a good man for the job, although Aliviado had never worked with Lim on a project in the harbor department and had never evaluated his work performance. Zmuda hired Lim for the structural design section without looking at any of his prior performance evaluations and after talking to him for five or ten minutes on a couple of occasions.

After Zmuda became his supervisor in 1994, Iwekaogwu submitted a request for overtime. About the same time two other members of the structural design section made similar requests. Zmuda approved overtime for the other two but tore up Iwekaogwu's overtime sheet. Zmuda told Iwekaogwu that he did not want him coming in and asking for overtime. After that, Iwekaogwu was not given overtime. Iwekaogwu asked for overtime again in 1995, but his request was denied. While Zmuda was the supervisor of the structural design section, everyone in the section was approved to do some overtime work except Iwekaogwu.[3]

In April 1995 Iwekaogwu telephoned Sandra Peelen of the equal employment opportunities section of the City. He complained to her about discriminatory treatment and followed up with a letter dated April 14, 1995. The

---

[3]Iwekaogwu filed an objection to exhibit 233 lodged by the City. That exhibit is an employee overtime report. We strike exhibit 233 as filed by the City as it appears to be incomplete when compared to the version of exhibit 233 filed by Iwekaogwu.

letter repeated many of the complaints made in the letter addressed to Burts and added others, including the denial of overtime. Iwekaogwu followed up with Peelen by telephone and met with her in June 1995. In July 1995 Iwekaogwu filed a complaint with the California Department of Fair Employment and Housing (DFEH). Zmuda learned of this complaint at the time it was filed. An employee of the personnel department suggested to Zmuda that he keep a log on Iwekaogwu when the DFEH complaint was filed, and Zmuda began doing so.

Meanwhile, Iwekaogwu received a job evaluation from Zmuda in May 1995. The evaluation indicated that Iwekaogwu "needs improvement." The evaluation stated that Iwekaogwu needed to pay more attention to checking of finished work and to ask more questions early in the design process to develop better engineering judgment.

Iwekaogwu filed the complaint in this case in December 1995.

On July 3, 1996 Zmuda again rated Iwekaogwu. The overall rating was "improvement needed." Zmuda noted that Iwekaogwu's performance had deteriorated. On July 18, 1996, Zmuda wrote a letter to Iwekaogwu to document "an oral warning given to you on July 8, 1996 as a result of insubordinate behavior and performance problems." The letter documented several instances when Iwekaogwu refused to provide information or was uncooperative. The events described in the letter had occurred over a one-year period.

On several occasions Zmuda told Iwekaogwu that Iwekaogwu had to leave the structural design section "because [Zmuda] considered [Iwekaogwu] a litigant and a filer of discrimination complaints." On October 8, 1996, Zmuda drew an outline of a dead man with fake blood, like a crime scene drawing, in the harbor department offices on some carpet that was about to be replaced. The drawing was three to four feet away from the entrance to Iwekaogwu's office. Zmuda testified that he had drawn the figure outside of his own office, which was across from Iwekaogwu's, and that the drawing was a Halloween joke. Iwekaogwu testified that Zmuda had told a witness that the drawing "shows that one of us would be leaving the structural section very soon and that individual knows that this is directed at him."

With respect to economic damages, testimony was introduced that the difference in salary between a civil engineer associate (the position Iwekaogwu held beginning August 1991) and a civil engineering is $12,000 to $15,000 per year. A civil engineer associate is paid $23.35 per hour, and

the difference in rate of pay between a civil engineer associate and a structural engineering associate is 51 cents per hour. Overtime is paid at time and one-half. For the year ending June 30, 1993, Iwekaogwu worked 58 hours of overtime.

With respect to evidence concerning Iwekaogwu's emotional distress, Iwekaogwu testified that he has nightmares about his supervisors "going after [him] at night," that he is under stress, that he has been treated by a doctor with medication for high blood pressure, that his relationship with his children has changed, that his wife threatened to leave him because of his "stressed-out" condition caused by his work situation, that he has trouble sleeping and that he eats less. He worries about mortgage payments and his future ability to afford private schooling for his children. Although he was referred for psychological counseling, there was no testimony that he received treatment from a psychologist or psychiatrist. No medical practitioner testified concerning his emotional distress. Iwekaogwu's wife testified that he used to be a fun-loving person but has changed. She testified that Iwekaogwu now cries a lot and has withdrawn from activities with his children and with social acquaintances. She confirmed that she had threatened to leave her husband because he was unhappy and would not communicate. She testified that they were having difficulty paying bills and that they could not afford to send their children to private school.

The case was submitted to the jury on May 21, 1997. On June 3 a juror sent a note to the judge, informing him that another juror, Ms. Hirtle, had admitted that she had sought the advice of her spouse about the case. The court inquired on the record of Ms. Hirtle. She stated that she had discussed the facts of the case with her husband, a union representative, and that her husband had said "yes, that's retaliation." Ms. Hirtle stated that she had communicated her husband's opinion to the other jurors but had not told the other jurors anything more than this and had not communicated anything about her husband's reasoning. The court indicated that it would excuse Ms. Hirtle and substitute an alternate juror.

The City moved for a mistrial. The court then questioned the other jurors about Ms. Hirtle's statements in the jury room and whether they would be able to disregard what Ms. Hirtle had said about her conversation with her husband and form their own opinions. The other jurors agreed with Ms. Hirtle's account of what was stated in the jury room and each agreed that he or she could disregard what Ms. Hirtle had said about her husband's opinion. The court denied the City's motion for a mistrial, excused Ms. Hirtle for cause, substituted an alternate juror and instructed the jurors that they were to disregard Ms. Hirtle's statements about her conversation with her husband.

The jury returned a special verdict, finding in favor of Iwekaogwu on his claim that he was retaliated against by the City for making a complaint of discrimination based on race or national origin. The jury was unable to reach a verdict on Iwekaogwu's claim that he was discriminated against on account of his race or national origin by the City's failure to promote him and on his claim that he was subjected to a hostile work environment. The jury awarded damages of $775,000. No question concerning punitive damages was submitted to the jury.

The City filed a motion for judgment notwithstanding the verdict on the ground that the evidence was insufficient as a matter of law to support the jury's verdict. The City also filed a motion for a new trial and for reduction of damages. In the new trial motion the City again argued insufficiency of the evidence and also argued that the damages award was not supported by the evidence and was excessive as a matter of law.

The City also argued that juror misconduct deprived it of a fair trial. The City offered the declarations of three jurors. These jurors testified that (1) one juror had been very aggressive in deliberations, threatening to walk out when deliberations were not going his way, interrupting other jurors, and telling others "you don't know what you're talking about," "shut up," and "you're stupid"; (2) that when Ms. Hirtle had stated what her husband had told her, the foreperson had tried to secure an agreement from other jurors not to tell anyone about Ms. Hirtle's misconduct; (3) that when the discussion of damages started, each juror had written down what amount he or she would award, that one juror stated he was "playing the averages" by proposing the amount of $2 million, and that the jury negotiated up and down from the various amounts proposed by jurors at the outset; and (4) that during the discussion of damages, when one juror pointed out the jury instruction stating that damages could not amount to punishment, another juror asserted that the jury ought to set an example and send a message to the City that it cannot treat any employee as Iwekaogwu was treated. The declaration of one juror stated that after Ms. Hirtle talked about her husband's opinion, the jurors "all discussed what had happened and everyone stated that he/she did not feel that Ms. Hirtle's announcement had in any way affected his/her decision, only Ms. Hirtle's."

Iwekaogwu filed declarations of other jurors 35 days after the City served and filed its notice of motion for new trial and its juror declarations. The City moved to strike these declarations as untimely under Code of Civil Procedure section 659a. The court overruled the City's objections.

The court denied the City's motion for judgment notwithstanding the verdict. The court denied the City's motion for new trial, conditioned on the

plaintiff's accepting a remittitur reducing the jury's verdict to $500,000. Regarding the City's allegations of juror misconduct, the court stated that it was "convinced . . . based on all of the evidence that, in general, the jurors did not commit misconduct," and that, regarding Ms. Hirtle, "the subsequent inquiry of other jurors and the instructions of the Court alleviated any possible taint regarding her consultation with her husband." In setting the remittitur amount, the court stated that it "was persuaded by the moving papers that the verdict was excessive due to the facts of the case and some possible questionable activity by some jurors during deliberations."

Plaintiff accepted the remittitur, and judgment was entered in the amount of $500,000. The City filed a timely notice of appeal.

## DISCUSSION

### I

On appeal the City first argues that the evidence was insufficient to establish the elements of a claim for retaliation under the California Fair Employment and Housing Act (FEHA), Government Code section 12900 et seq. The City concedes that in considering this issue " ' ". . . the appellate court must read the record in the light most advantageous to the plaintiff, resolve all conflicts in his favor, and give him the benefit of all reasonable inferences in support of the original verdict. . . ." ' . . ." (*Stubblefield Construction Co.* v. *City of San Bernardino* (1995) 32 Cal.App.4th 687, 703 [38 Cal.Rptr.2d 413], citations omitted.)

The FEHA makes it unlawful "[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint . . . under this [Act]." (Gov. Code, § 12940, subd. (f).) To establish a prima facie case of retaliation, ". . . the plaintiff must show that he engaged in a protected activity, his employer subjected him to adverse employment action, and there is a causal link between the protected activity and the employer's action." (*Flait* v. *North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476 [4 Cal.Rptr.2d 522].)

The City alleges that only employment actions after May 1994 could be considered by the jury in determining whether Iwekaogwu was retaliated against by the City, because his first complaint of employment discrimination was the letter delivered to Burts's office in that month. However there was evidence that, prior to August 1991, Iwekaogwu had threatened to file a race discrimination action against the harbor department

(after Anderson stated that Iwekaogwu should seek promotional opportunities outside the harbor department), and that this threat was communicated to two of Anderson's supervisors. The City concedes that an employee engages in protected activity under the FEHA when he threatens to file a charge of employment discrimination. (See, e.g., *Gifford* v. *Atchison, Topeka and Santa Fe Ry. Co.* (9th Cir. 1982) 685 F.2d 1149, 1156, fn. 3; *Silver* v. *KCA, Inc.* (9th Cir. 1978) 586 F.2d 138, 141, fn. 2.)

Thus there was evidence that Iwekaogwu engaged in activity that was protected from retaliation as early as August 1991. Subsequently Iwekaogwu experienced adverse employment actions (1) when he was not promoted to the structural engineering associate position in the structural design section and instead Angel Lim was given that job, (2) when he was not promoted to the level of civil engineer, and (3) when he was denied his requests for overtime.

The City argues that the position of structural engineering associate never was posted for promotion. However, although there was not a formal posting, the structural design section found a way to fill the position by transferring Lim from another section of the harbor department. The point is that the job was filled and Iwekaogwu did not fill it.

The City also argues that Iwekaogwu's place on the eligibility list for civil engineer never was high enough to allow him to be considered for that position. However, the City was willing to fill a civil engineer position in another section with someone who actually had failed the civil engineer examination that Iwekaogwu had passed. If the person who failed the examination was eligible for a civil engineer position, then the jury could have concluded that Iwekaogwu should have been eligible for the position as well, regardless of his place on the eligibility list.

Thus there was evidence from which a jury could have concluded that in 1991 Iwekaogwu engaged in protected activity by threatening to file a race discrimination complaint and that Iwekaogwu was subjected to adverse employment actions thereafter. The City argues, however, that there was insufficient evidence under the three-stage approach of *McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792, 802-804 [93 S.Ct. 1817, 1824-1825, 36 L.Ed.2d 668], to allow a jury to conclude that there was a causal relationship between the protected activity and the adverse employment actions. The City argues that it offered a legitimate, nonretaliatory explanation for its acts (poor performance by Iwekaogwu), and that Iwekaogwu failed to show that this explanation was pretextual because he did not offer evidence demonstrating that the criticisms of his performance were inaccurate.

The City takes too narrow a view of the type of evidence that may be offered to show that an employer's nonretaliatory explanation for its actions is pretextual. A plaintiff is not limited to a direct attack on the employer's explanation. At least three types of evidence can be used to show pretext: (1) direct evidence of retaliation, such as statements or admissions, (2) comparative evidence, and (3) statistics. (*Penk* v. *Oregon State Bd. of Higher Educ.* (9th Cir. 1987) 816 F.2d 458, 462 [considering sex discrimination claim].) Iwekaogwu offered both direct evidence of retaliation and comparative evidence.

Direct evidence of retaliation may consist of remarks made by decision-makers displaying a retaliatory motive. (See *Lindahl* v. *Air France* (9th Cir. 1991) 930 F.2d 1434, 1439 [sexist comments in sex discrimination case].) The facts presented at trial include several remarks by Iwekaogwu's supervisors that can be interpreted as indicating an intent to retaliate against Iwekaogwu for his complaints of discrimination.

Most directly, there was evidence that Zmuda told Iwekaogwu on several occasions that Iwekaogwu had to leave the structural design section because Zmuda considered him a litigant and a filer of discrimination complaints. Poignantly demonstrating this attitude was Zmuda's statement that the "crime scene" outline drawn outside Iwekaogwu's office was intended to show that "someone" will be leaving the structural design section soon.

It was Zmuda who selected the person to fill the position of structural engineering associate and who refused Iwekaogwu's requests for overtime. Zmuda's supervisor, Anderson, had met with Iwekaogwu in May 1994 concerning the complaints of discrimination in the Burts letter. This occurred prior to Zmuda's decisions on the structural engineering associate position and the overtime requests. Indeed Anderson appointed Zmuda to be Iwekaogwu's supervisor immediately following Anderson's meeting with Iwekaogwu concerning his discrimination charge. The jury could have inferred that when Anderson appointed Zmuda to be Iwekaogwu's supervisor, he told Zmuda of Iwekaogwu's discrimination charge, even though Zmuda denied that he knew of Iwekaogwu's complaints before July 1995.

This inference (that Anderson told Zmuda of Iwekaogwu's discrimination charge) is supported by Anderson's exceedingly defensive reaction to Iwekaogwu's complaints of discrimination. Anderson's reaction also is direct evidence of an intent to retaliate. Anderson was assigned responsibility for addressing the allegations Iwekaogwu made in his letter to Burts. When Anderson met with Iwekaogwu, he categorically denied that there was any discrimination in the harbor department, apparently without conducting an

investigation. Even more significantly, Anderson made comments indicating that the only conduct he considered to rise to the level of discrimination was conduct such as that of the Ku Klux Klan, Neo Nazis and Skinheads. Anderson's offensive comments plainly allow an inference that he did not take Iwekaogwu's complaints seriously and that he harbored a deep resentment about the complaints. At the same meeting he told Iwekaogwu not to expect any promotions.

Anderson was Iwekaogwu's second-level supervisor when each of the adverse employment decisions described above was made. An individual employment decision should not be treated as a " ' "watertight compartment, with discriminatory statements in the course of one decision somehow sealed off from (that is, irrelevant to) every other decision." ' " (*Clark* v. *Claremont University Center* (1992) 6 Cal.App.4th 639, 667 [8 Cal.Rptr.2d 151], quoting *Roebuck* v. *Drexel University* (3d Cir. 1988) 852 F.2d 715, 734, fn. 32.) The jury could have inferred that, in retaliation for Iwekaogwu's complaints, Anderson ensured that Iwekaogwu was not given further promotions or opportunities for overtime.

Iwekaogwu also offered comparative evidence of pretext; that is, evidence that he was treated differently from others who were similarly situated. Although Iwekaogwu's performance was criticized, Zmuda did not even review the performance evaluations of the person hired to fill the structural engineering associate position and only conducted a brief interview of that person. A civil engineer position in the harbor department was filled by a person who had failed the civil engineer examination that Iwekaogwu had passed. Iwekaogwu was the only engineer in the structural design section who was not approved to perform at least some overtime work after 1994. All of these employment decisions took place after Iwekaogwu's discrimination complaints had been communicated to Anderson's supervisors in 1991. The denial of overtime and the decision concerning the structural engineering associate position occurred after Anderson met with Iwekaogwu about his complaint to Burts. From this evidence of disparate treatment, a jury could have inferred that Iwekaogwu experienced adverse employment actions in retaliation for his complaints of discrimination.

Iwekaogwu offered sufficient evidence to create an inference that the City's reasons for its employment actions with respect to Iwekaogwu were pretextual. The jury's verdict on the retaliation charge is supported by substantial evidence.

## II

The City contends that the trial court should have granted its motion for a new trial on grounds of juror misconduct. On appeal

from denial of a motion for new trial on grounds of juror misconduct, the appellate court, " ' " 'has a constitutional obligation [citation] to review the entire record, including the evidence, and to determine independently whether the act of misconduct, if it occurred, prevented the complaining party from having a fair trial.' " ' " (*English* v. *Lin* (1994) 26 Cal.App.4th 1358, 1364 [31 Cal.Rptr.2d 906], quoting *Smoketree-Lake Murray, Ltd.* v. *Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1745 [286 Cal.Rptr. 435].)

While a presumption of prejudice arises when there has been any juror misconduct, the presumption may be rebutted by evidence that no prejudice resulted. (*English* v. *Lin, supra,* 26 Cal.App.4th at p. 1364.) In this case, considering only the record that was created during juror deliberations and the declarations submitted by the City,[4] we conclude that no prejudice resulted from any juror misconduct that occurred.

The City first argues that Ms. Hirtle's misconduct in seeking her husband's opinion of the case infected the remainder of the jury. The court obtained a representation from each juror that he or she could refrain from considering Ms. Hirtle's comments about her husband's views and that those comments would have no bearing on his or her consideration of the case. The court instructed the jury to refrain from considering anything Ms. Hirtle said about her conversation with her husband.

The court's colloquy with the other jurors is evidence that Ms. Hirtle's misconduct did not infect the verdict. Ms. Hirtle did not communicate to the other jurors any of her husband's reasons for his views. There is no evidence that the jurors failed to follow the court's instructions to ignore Ms. Hirtle's comments about her husband. The City expresses concern that at one point some jurors proposed to agree not to tell the judge of Ms. Hirtle's conduct. But this evidence does not impeach the jurors' statements to the court that they would not consider what Ms. Hirtle had said about her husband. To the contrary, in a declaration filed by the City, one juror stated that even before Ms. Hirtle's misconduct was reported to the court, the jurors had assured each other that what Ms. Hirtle had reported about her husband would not affect any juror's views. No prejudice resulted from Ms. Hirtle's misconduct.

The City also argues that one juror engaged in misconduct that affected the outcome of the case by rude behavior and strong words directed to fellow

---

[4]The City argues that the trial court was precluded by Code of Civil Procedure section 659a from considering the declarations filed by Iwekaogwu because they were filed outside the time limits prescribed by that section. Because we find on the basis of the declarations filed by the City that the court properly denied the new trial motion, we need not consider whether the time limits for filing affidavits or declarations by a party opposing a motion for new trial may be extended by the court.

jurors. No juror declaration stated that any juror voted a particular way because he or she was intimidated by the conduct of any other juror. The courts have recognized that "[i]f transient comments made in the heat of discussion during deliberations become a potential vehicle for attacking the verdict of the jury, freedom of discussion in the jury room is chilled, and the free exchange of ideas is inhibited." (*Tillery* v. *Richland* (1984) 158 Cal.App.3d 957, 977 [205 Cal.Rptr. 191].) Thus jurors' "remarks may be candid, even unflattering. But cutting and sarcastic words do not ipso facto constitute jury misconduct." (*Ibid.*) Our review of the record, including the description of deliberations included in the City's juror declarations, convinces us that the juror's "cutting and sarcastic words" did not constitute juror misconduct.

The City also complains that the same juror gave emotional descriptions of instances of discrimination he had seen as a reserve police officer. But "[j]urors do not enter deliberations with their personal histories erased, in essence retaining only the experience of the trial itself." (*Moore* v. *Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 741 [223 Cal.Rptr. 859].) A juror does not commit misconduct merely by describing a personal experience in the course of deliberations. (*Id.* at pp. 741-742.) There is no evidence that any juror decided the case based on the juror's description of his own experiences rather than on the basis of the evidence presented at trial. We find no basis for concluding that misconduct occurred.

The City also contends that the jury committed misconduct by "an arbitrary and flippant process of assessing damages by voting on various numbers proposed without regard to the evidence." Putting to one side the issue of whether the damages awarded were excessive, there is no evidence of misconduct in the manner in which the jurors went about their deliberations. The juror declarations submitted by the City do not establish that there was a quotient verdict—a verdict determined by an agreement in advance to average the amounts suggested by each juror without further deliberation. (See *Chronakis* v. *Windsor* (1993) 14 Cal.App.4th 1058, 1064-1065 [18 Cal.Rptr.2d 106] [defining quotient verdict].) It is not misconduct for jurors to use an average as a basis for further consideration and deliberation. (*Fredrics* v. *Paige* (1994) 29 Cal.App.4th 1642, 1647 [35 Cal.Rptr.2d 246].) The juror declarations in this case state only that individual jurors suggested damage awards and that several of these figures were selected for consideration and further balloting. This was not misconduct.

Finally, the City argues that a new trial should be ordered because a juror stated that the damages award should set an example and send a message to the City that it cannot treat its employees like Iwekaogwu was treated. The

jury was not permitted to include punitive damages in its verdict. ■ A statement by a juror suggesting that a verdict should include an impermissible category of damages is not by itself jury misconduct. (*Moore* v. *Preventive Medicine Medical Group, Inc., supra,* 178 Cal.App.3d at p. 740.) "[T]o establish misconduct requiring reversal, juror declarations must establish '[a]n express agreement by the jurors to include such [impermissible categories of damages] in their verdict, or extensive discussion evidencing an implied agreement to that effect.' " (*Ibid.,* quoting *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 81 [137 Cal.Rptr. 863, 562 P.2d 1022].) ■ The juror declarations filed by the City evidence only one remark made by one juror. They do not establish either an express agreement to include exemplary damages in the verdict or that there was extensive discussion of the topic. (Cf. *Tramell* v. *McDonnell Douglas Corp.* (1984) 163 Cal.App.3d 157, 172-173 [209 Cal.Rptr. 427] [extensive discussion among jurors evidencing an implied agreement to inflate verdict to compensate for attorney fees and taxes].)

We conclude that no act of juror misconduct precluded the City from receiving a fair trial.

### III

■ Although the trial court held that "in general, the jurors did not commit misconduct," the court concluded that "the verdict was excessive ·due to the facts of the case and some possible questionable activity by some jurors during deliberations." It was a "permissible procedure" for the court to include questionable activity by the jury "as a reason for his conclusion that damages were excessive." (*Tramell* v. *McDonnel Douglas Corp., supra,* 163 Cal.App.3d at p. 171.) The court granted a remittitur that was accepted by the plaintiff, thus reducing the jury's $750,000 verdict to a $500,000 award. The City nonetheless contends that the $500,000 award is excessive as ·a matter of law.

■ "The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Seffert* v. *Los Angeles Transit Lines*

(1961) 56 Cal.2d 498, 506-507 [15 Cal.Rptr. 161, 364 P.2d 337], quoted with approval in *Fagerquist* v. *Western Sun Aviation, Inc.* (1987) 191 Cal.App.3d 709, 727 [236 Cal.Rptr. 633].)

■ The verdict in this case was not broken down into economic and noneconomic damages. From the evidence introduced at trial, it is clear that economic damages could have been only a relatively small portion of the jury's award. If Iwekaogwu had been given the structural engineer associate position instead of Lim, his salary would have been increased by $1,060.80 per year for the approximately two and one-half years between when Lim received the job and the time of trial. If, in addition to this promotion, Iwekaogwu had been permitted to work overtime during this period, and if he had worked 58 hours of overtime as he did in 1993, he could have earned an additional $2,075.82 per year for the approximately two and one-half years he was denied overtime. Economic damages on this basis would be less than $10,000. If the jury found that, absent retaliation, Iwekaogwu would have been promoted to civil engineer, his damages would have been $12,000 to $15,000 per year, for a maximum of $37,500 if Iwekaogwu had been promoted to civil engineer in the fall of 1994.

The issue, then, is whether the evidence of Iwekaogwu's emotional distress damages can support an award of over $450,000 for that element of damages. Giving deference to the ruling of the trial court, we cannot say that the amount of the remittitur was excessive as a matter of law.

In *Watson* v. *Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1293-1294 [261 Cal.Rptr. 204], cited in the City's brief, the court held that an award of over $1 million in emotional distress damages was not excessive in a race discrimination case. In that case, to be sure, the plaintiff's symptoms of emotional distress were more severe than Iwekaogwu's symptoms. In *Watson* the plaintiff, in addition to nightmares, loss of appetite, and loss of interest in ordinary activities, suffered from a severe psychiatric disorder which would require medical treatment. (*Id.* at p. 1283.) Iwekaogwu had been referred for psychological treatment but did not receive such care. Nevertheless, the jury could have concluded that Iwekaogwu should receive such treatment. The jury also could have concluded that he was suffering from emotional distress that significantly altered his ability to enjoy life and to engage in ordinary activities, that interfered with his family life, and that included fear of physical harm from coworkers. The remittitur amount chosen by the trial court was not excessive as a matter of law in light of the evidence presented at trial and the deference due the trial court's exercise of its discretion. (See also *Bihun* v. *AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 997 [16 Cal.Rptr.2d 787] [award of $662,000 for emotional distress in sex harassment case is "well within the range of awards in similar cases"].)

## DISPOSITION

The judgment is affirmed. Iwekaogwu shall receive his costs on appeal.

Vogel (C. S.), P. J., and Epstein, J., concurred.

A petition for a rehearing was denied November 5, 1999, and appellant's petition for review by the Supreme Court was denied January 25, 2000.