[No. D053492. Fourth Dist., Div. One. July 15, 2009.]

SASCO ELECTRIC, Plaintiff and Appellant, v.
FAIR EMPLOYMENT AND HOUSING COMMISSION, Defendant and
Respondent;
ZIBUTE SCHERL, Real Party in Interest and Respondent.

534

COUNSEL

Quadros & Johnson, Benjamin A. Johnson and S. Edward Slabach for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Louis Verdugo, Jr., Assistant Attorney General, Angela Sierra and Antonette Benita Cordero, Deputy Attorneys General, for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

**OPINION**

## McCONNELL, P. J.—

## INTRODUCTION

An employer appeals a judgment denying a petition for administrative mandate challenging a decision by the Fair Employment and Housing Commission (Commission) finding the employer committed pregnancy discrimination in violation of the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.). The employer contends the Commission abused its discretion because the Commission failed to proceed in the manner required by law and its findings are not supported by substantial evidence. We affirm the judgment.

I

## STANDARD OF REVIEW

On appeal from a judgment denying a petition for writ of administrative mandamus, we consider "whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) Where it is claimed that the findings are not supported by the evidence and the case, as here, does not involve a fundamental vested right, "abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (*Id.*, § 1094.5, subd. (c); see *American National Ins. Co. v. Fair Employment & Housing Com.* (1982) 32 Cal.3d 603, 607 [186 Cal.Rptr. 345, 651 P.2d 1151].)

"Substantial evidence" is evidence of " 'ponderable legal significance.' " (*People v. Bassett* (1968) 69 Cal.2d 122, 138–139 [70 Cal.Rptr. 193, 443 P.2d 777].) " 'It must be reasonable in nature, credible, and of solid value.' " (*Id.* at p. 139; accord, *Ofsevit v. Trustees of Cal. State University & Colleges* (1978) 21 Cal.3d 763, 773, fn. 9 [148 Cal.Rptr. 1, 582 P.2d 88].) In determining whether an administrative decision is supported by substantial evidence, "[w]e may not isolate only the evidence which supports the administrative

finding and disregard other relevant evidence in the record. [Citations.] On the other hand, [we may not] disregard or overturn the Commission's finding ' "for the reason that it is considered that a contrary finding would have been equally or more reasonable." ' [Citations.] The ultimate issue in an administrative mandamus proceeding is whether the agency abused its discretion. An abuse of discretion is 'discretion exercised to an end or purpose not justified by and clearly against reason, all of the facts and circumstances being considered.' [Citations.] Unless the finding, viewed in the light of the entire record, is so lacking in evidentiary support as to render it unreasonable, it may not be set aside." (*Northern Inyo Hosp. v. Fair Emp. Practice Com.* (1974) 38 Cal.App.3d 14, 24 [112 Cal.Rptr. 872]; accord, *Johnson Controls, Inc. v. Fair Employment & Housing Com.* (1990) 218 Cal.App.3d 517, 531–532 [267 Cal.Rptr. 158].)

II

FACTUAL AND PROCEDURAL BACKGROUND

A.   *Factual Background*[1]

SASCO Electric (SASCO), an electrical contractor, owns the El Navegante, a 70-foot yacht it uses to entertain guests. The yacht is captained by David McIntyre, a SASCO management employee with authority to hire and fire employees. From late April to late July each year, SASCO sends the yacht to Mexico. SASCO's guests fly to Mexico to meet the yacht for two-to-three-night fishing excursions approximately 25 to 50 miles off the coast. SASCO also uses the yacht each December to participate in the annual Christmas Boat Parade in Newport Beach, California.

In late 2002 and early 2003, the demand for SASCO's services declined and SASCO began cutting overhead costs and laying off staff. Nonetheless, in January 2003, McIntyre hired Zibute Scherl to work as a deckhand on the yacht. Around the same time, SASCO purchased the Angler, a 26-foot fishing boat.

---

[1] Consistent with the applicable standard of review, we summarize the facts in a manner that resolves all conflicts and draw all reasonable inferences in favor of the Commission's findings. (*Johnson Controls, Inc. v. Fair Employment & Housing Com., supra,* 218 Cal.App.3d at p. 531.)

Before joining the yacht's crew, Scherl had worked as a deckhand and later as second captain on the Cortez, a 60-foot sport fishing boat. She had previously worked for a water taxi service in Baltimore Harbor, for the Ocean Institute aboard historic boats, and on a variety of other boats, including a three-masted schooner, a paddle wheeler, and a tug boat. In addition, she is licensed by the United States Coast Guard as a United States Merchant Marine Officer. Obtaining this license required Scherl to have 720 days at sea, complete 80 hours of classroom training, and pass a written examination.

In September 2003, Scherl became second captain in training and McIntyre offered to train her to dock the yacht. She testified the training never occurred because of scheduling problems. He believes she avoided the training because she was not ready for it. Both believe she would have successfully completed the training eventually and he never indicated her job would be in jeopardy if she did not complete the training right away.

In December 2003, Scherl met Jerry Jordan, SASCO's executive director. Jordan is responsible for the yacht's finances and McIntyre reports to him. Jordan congratulated Scherl on her recent marriage and told her, "Whatever you do, don't get pregnant." Jordan denies this exchange occurred.

In January 2004, Scherl became second captain.[2] Around the same time, McIntyre hired Timothy Best to be a deckhand on the yacht. McIntyre's wife, Jane McIntyre (Jane), also worked for SASCO aboard the yacht.

In early February 2004, Scherl informed McIntyre and Jane of her pregnancy. Jane reacted to the news with happiness and excitement. Conversely, McIntyre was admittedly disappointed by the news because he thought Scherl's pregnancy would impact her working on the yacht. In his experience, mothers do not want to work in the boating business. In addition, he thought her plan to work as long as possible during her pregnancy was "cavalier." He also had liability concerns. Consequently, he told Scherl she would need to get a medical release from her doctor in order to make the upcoming trip to Mexico in late April 2004.

The morning after Scherl informed McIntyre of her pregnancy, McIntyre telephoned Jordan to discuss McIntyre's liability concerns. Jordan admits McIntyre called and informed him of Scherl's pregnancy, but denies discussing liability concerns with McIntyre.

The same day McIntyre also discussed Scherl's pregnancy with Best. McIntyre expressed concern about Scherl's exposure to chemicals and fumes

---

[2] The parties stipulated to this fact; however, McIntyre denies Scherl ever held this position.

as well as the potential she could slip and miscarry. He told Best he could not take Scherl to Mexico and was going to have to find someone else.

On February 20, 2004, SASCO sent Scherl a letter congratulating her on her pregnancy and requesting a release from her physician indicating she could perform her regular duties "without restrictions or limitations and without undue risk to yourself or others." The letter requested submission of the release by March 15, 2004. However, on February 23, 2004, SASCO sent Scherl an e-mail requesting she submit the release as soon as possible. When Scherl mentioned the release request to McIntyre, he told her to "hold off" on getting the release and to "wait and see what happens first."

Despite McIntyre's direction to hold off on getting the medical release, Scherl submitted the release form to her doctor. Her doctor completed the form and returned it to Scherl on or around March 4, 2004. The release indicated and Scherl's doctor confirmed in deposition testimony that Scherl was not incapacitated by and did not have any work restrictions associated with her pregnancy in February 2004. However, the release further indicated and Scherl's doctor confirmed in deposition testimony that, after May 10, 2004, which was approximately when Scherl's pregnancy became viable, Scherl should not work where she could be knocked over and should not be out to sea for several days at a time. Scherl never provided the release to SASCO.

On February 24, 2004, Jordan sent McIntyre an e-mail stating SASCO's chairman had changed his budget and would only allow him to have two full-time employees on the payroll: himself and a deckhand. While the yacht was in Mexico and during the December parade season, McIntyre would also be allowed one part-time contract laborer. Consequently, the e-mail stated "Jane and the third person will come out of the budget at the end of the Feb." Prior to learning Scherl was pregnant, Jordan never informed McIntyre of an anticipated reduction in the yacht's budget or the corresponding need to reduce the yacht's staff.

On February 27, 2004, McIntyre provided Scherl with a copy of Jordan's e-mail and informed her he was laying her off. When she asked McIntyre why she had been selected for layoff, McIntyre evaded the question. However, he never indicated her work was unsatisfactory. To the contrary, during her employment, he continually told her she was doing a good job, he was confident in her abilities, and he was happy to have her as part of his crew. In addition, after he terminated her employment, he sent her an unsolicited letter of recommendation describing her as "the hardest working, responsible, boat savvy individual to work with me during my seventeen years on this vessel." He also told Jane that Scherl was the best he had ever seen.

Sometime in March 2004, Scherl telephoned McIntyre and asked him again why her employment had been terminated. He told her she had not done anything wrong on the yacht and he would not have terminated her employment if she had not been pregnant. He never mentioned her inability to dock the yacht.

McIntyre stated he laid off Scherl instead of Best because he was "concerned about her still being cavalier about working on the boat for too long when she was pregnant" and Best was capable of running the yacht without him.[3] McIntyre admits he told two or three people he laid off Scherl because she was pregnant; however, he claims he was being sarcastic at the time.

Jane stated McIntyre told her he laid off Scherl because "he had to get rid of two people and she can't drive the boat and she's pregnant." Best stated both McIntyre and Jane told him they felt bad about terminating Scherl's employment, but they had to let her go because the Mexico trip was unsafe for a pregnant woman. In addition, McIntyre told Best he laid off Scherl instead of firing her because "[t]hat way we can't be sued." He also told Best, Jane might need to stay home a few weeks.

Jane actually stayed off work for about one week and then resumed working aboard the yacht as an independent contractor. According to her, she has since returned to being on SASCO's payroll and her paychecks are direct deposited. Regardless of her payroll status, her duties and work hours did not change.

Shortly after McIntyre terminated Scherl's employment, he suggested she might be able to work on the yacht on a "cash" basis, but he never contacted her further about this possibility. Instead, in April 2004, a few weeks before the yacht was to depart for Mexico, McIntyre hired Calvin Cooper to work on the yacht as an independent contractor deckhand. Unlike Scherl, Cooper had no prior boat-handling experience. Then, the day before the yacht was scheduled to depart to Mexico, Best resigned his employment with SASCO for emergency family reasons and McIntyre put Cooper on SASCO's payroll. He also hired Trevor Dodge, a friend of Cooper's, to be an independent contractor deckhand. Again, unlike Scherl, Dodge had no prior experience as a crewmember.

Scherl describes the termination of her employment with SASCO as "devastating." She was "incredibly upset" and cried the rest of the day. She felt "pure shock, betrayal, [and] embarrassment." She has been "obsessed"

---

[3] Although McIntyre had never let either Scherl or Best dock the yacht, he said he knew Best could do it because he had once seen Best dock a sport fishing boat that was 15 feet longer than the yacht.

with boating since she was 10 years old and planned to have a career in boating since high school. Consequently, when McIntyre terminated her employment, she felt her life had been taken away from her.

She cried every day for over a month and was unable to leave her house. She experienced nausea, insomnia, headaches, and severe depression for at least two months afterwards. She was angry and ashamed. She was afraid to approach her former employer or other potential employers because she felt they would look down at her for getting pregnant and losing her job. She felt she had been deprived of her right to decide when during her pregnancy she should stop working and when she should return to work after her baby's birth.

Scherl's relationship with her husband also suffered because of her termination. They argued about things they would not normally argue about and she stopped trusting him because he told her "everything would be okay regarding the pregnancy and it wasn't." Their physical relationship was "almost non-existent" and Scherl had contemplated divorce because she was concerned that having another child would further harm her career.

The financial pressure associated with the loss of her income and benefits also took its toll on them. They did not have enough money to pay their monthly bills, resulting in their home phone being disconnected and their needing to borrow money from his parents to cover health insurance and, at times, rent. Some nights they had to scrape together change just to be able to buy food for dinner.

According to Scherl's husband, she was crushed, crying and angry at the loss of her job. She was severely embarrassed and did not want to face her boating colleagues. According to her father-in-law, a licensed marriage and family therapist, before her job loss Scherl was "a happy, cheerful, hard-working woman, very playful, very fun to be around, very enjoyable." After her job loss, she was "tearful, disappointed, angry, anxious [and] afraid." She was "not enjoying life as much."

Scherl has previously been diagnosed with bipolar disorder, but does not take medication for the disorder. In addition, her father-in-law has never observed symptoms of the disorder in her. Although Scherl's health insurance included some mental health coverage, she was not aware of the coverage and did not seek mental health treatment after McIntyre terminated her employment.

## B.  *Procedural Background*

Scherl filed a complaint with the Department of Fair Employment and Housing (the Department). The Department subsequently issued an accusation alleging SASCO discriminated against Scherl in violation of FEHA by terminating her employment because of her pregnancy.[4]

Following a four-day evidentiary hearing, an administrative law judge issued a proposed decision, finding against SASCO and awarding Scherl backpay and $85,000 in emotional distress damages. The proposed decision also found there was clear and convincing evidence of oppression or malice by SASCO and imposed an administrative fine of $25,000. The Commission adopted the proposed decision.

SASCO petitioned the Commission for reconsideration, which the Commission denied. SASCO then petitioned the superior court for a writ of administrative mandamus under Code of Civil Procedure section 1094.5. The court denied the petition, finding SASCO had failed to establish the Commission's decision was in excess of jurisdiction or that the Commission abused its discretion.

SASCO appeals, arguing the Commission's liability finding is not supported by substantial evidence because the Commission never considered Scherl's inability to dock the yacht in determining whether SASCO had a justifiable basis for laying off Scherl. In addition, SASCO argues the Commission's award of backpay for the period between May 10 and September 17, 2004, is contrary to law and not supported by substantial evidence because there is undisputed medical evidence Scherl was disabled by pregnancy during this period. SASCO also argues the Commission's award of $85,000 in emotional distress damages is not supported by substantial evidence because the evidence relied upon by the Commission is subjective and speculative. Finally, SASCO argues there is not clear and convincing evidence of fraud, oppression, and malice on its part to support the Commission's imposition of the $25,000 fine.[5] We conclude SASCO's arguments have no merit.

---

[4] The accusation also alleged SASCO discriminated against Scherl by paying her less than comparable male employees. The Commission found against SASCO on this point and SASCO is not challenging this finding on appeal.

[5] SASCO's opening brief argues the superior court's findings and decisions are flawed for similar reasons. Our review is of the Commission's findings and decision, not the superior court's. (*TG Oceanside, L.P. v. City of Oceanside* (2007) 156 Cal.App.4th 1355, 1370 [68 Cal.Rptr.3d 320]; *Johnson Controls, Inc. v. Fair Employment & Housing Com., supra,* 218 Cal.App.3d at p. 531.) Accordingly, we do not address SASCO's arguments challenging the superior court's findings and decision.

## III

## DISCUSSION

A.  *Liability*

As we previously explained, our review of the Commission's decision is governed by the substantial evidence test. In this case, we may presume the existence of substantial evidence to support the Commission's findings because SASCO did not set forth all of the material facts in its opening brief. Instead, SASCO slanted its statement of facts by omitting material facts unfavorable to its position. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881–882 [92 Cal.Rptr. 162, 479 P.2d 362]; *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409–410 [58 Cal.Rptr.3d 527].)

Even without this presumption, we conclude there is substantial evidence to support the Commission's finding that there was a causal connection between Scherl's pregnancy and SASCO's decision to end her employment. McIntyre specifically told Scherl she would not have lost her job if she had not been pregnant and he admitted he chose to lay off Scherl in part because he was "concerned about her still being cavalier about working on the boat too long when she was pregnant." He also told his wife Jane that Scherl's pregnancy was one of the reasons he let her go. Likewise, he and Jane told Best they let Scherl go because the Mexico trip was unsafe for a pregnant woman.

While SASCO insists the reason McIntyre laid off Scherl instead of Best is that she could not dock the yacht and Best could, there is substantial evidence in the record to support the Commission's finding this reason was pretextual. Perhaps most telling on this point is McIntyre's remark to Best that he could not take Scherl to Mexico and was going to have to find someone else. According to Best, this remark occurred a day or so after McIntyre learned of Scherl's pregnancy, which was well before McIntyre received Jordan's e-mail regarding the need to reduce the yacht's full-time staff.

Moreover, there is substantial evidence in the record Scherl could have docked the yacht had she been required to do so. Scherl knows the mechanics of docking and had previously docked the Cortez between 25 to 40 times. Before McIntyre terminated her employment, she had also docked the Angler a couple of times, albeit not perfectly because of the Angler's tendency to fishtail. In addition, John Hughes, the owner and captain of the Cortez, testified Scherl had the ability to dock the yacht if necessary. Scherl's husband, who captains a sport fishing boat and has experience docking both

the yacht and the Angler, agreed she could dock the yacht. Even McIntyre acknowledged that a person who could dock the Angler could also dock the yacht.

Further undermining SASCO's proffered reason for Scherl's layoff is McIntyre's failure to even attempt to recall her when he needed a contract deckhand for the Mexico trip or when he needed a replacement for Best. Given Scherl's extensive experience, McIntyre's high regard for her abilities and work performance, the fact that she was laid off rather than discharged, and McIntyre's lack of knowledge of any future restrictions on Scherl's ability to work, McIntyre's choice of Cooper over Scherl is inexplicable absent unlawful consideration of her pregnancy.

## B. *Backpay*

To remedy SASCO's discrimination, the Commission ordered SASCO to pay Scherl backpay for, among other periods, the date of her discharge to September 17, 2004, the date of her child's birth. SASCO contends the Commission should not have awarded Scherl backpay for the period between May 10 and September 17, 2004, because, based on the information on the release form and the deposition testimony of Scherl's doctor, she was disabled by pregnancy during this period.[6]

Assuming without deciding that Scherl became disabled by pregnancy on May 10, 2004, the disability did not preclude the Commission from awarding backpay for the period between May 10 and September 17, 2004. Had SASCO not unlawfully terminated Scherl's employment, it would have been required to reasonably accommodate her disability, including temporarily transferring her to a less strenuous or hazardous position. (Gov. Code, § 12945, subd. (b); Cal. Code Regs., tit. 2, §§ 7291.5, subd. (a)(9)–(10), 7291.6, subd. (a).) Therefore, in order to establish Scherl was not entitled to backpay between May 10 and September 17, 2004, SASCO had to prove not just that she was disabled, but also that her disability could not have been accommodated. (*Davis v. Los Angeles Unified School Dist. Personnel Com.* (2007) 152 Cal.App.4th 1122, 1140–1141 [62 Cal.Rptr.3d 69] [Employer has the burden of proving an employee failed to mitigate backpay damages, including the burden of proving an employee would not have earned any wages because of a nonindustrial illness or injury]; *Donald Schriver, Inc. v. Fair Employment & Housing Com.* (1986) 220 Cal.App.3d 396, 407 [46

---

[6] Under Commission regulations, "[a] woman is 'disabled by pregnancy' if, in the opinion of her health care provider, she is unable because of pregnancy to work at all or is unable to perform any one or more of the essential functions of her job or to perform these functions without undue risk to herself, the successful completion of her pregnancy, or to other persons." (Cal. Code Regs., tit. 2, § 7291.2, subd. (g).)

Cal.Rptr.2d 440, 230 Cal.Rptr. 620].) SASCO offered no evidence to show it could not have accommodated Scherl's work restrictions. Instead, SASCO speculates Scherl would have been unwilling to accept any work off the yacht as an accommodation because she considered boating her career. Such speculation is not sufficient to meet SASCO's burden, particularly since any off-yacht work SASCO provided Scherl to accommodate her pregnancy would have been temporary rather than a career change. Accordingly, we conclude the Commission did not abuse its discretion in awarding Scherl backpay between May 10 and September 17, 2004.

## C. *Emotional Distress Damages*

■ If the Commission finds an employer discriminated against an employee in violation of FEHA, the Commission may award damages for the employee's resulting "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." (Gov. Code, § 12970, subd. (a)(3).) In determining whether to award emotional distress damages and in what amount, the Commission considers how the employer's discrimination affected the employee's physical and mental well-being; personal integrity, dignity, and privacy; ability to work and career advancement potential; personal and professional reputation; family relationships; and access to the job and ability to associate with peers and coworkers. (Gov. Code, § 12970, subd. (b).) The Commission also considers "the duration of the emotional injury, and whether that injury was caused or exacerbated by [the employee's] knowledge of [the employer's] failure to respond adequately to, or to correct, the discriminatory practice or by the egregiousness of the discriminatory practice." (*Ibid.*)

In this case, after considering the above factors, the Commission awarded Scherl $85,000 in emotional distress damages. SASCO contends the award is not supported by substantial evidence because the evidence relied upon by the Commission is subjective and speculative. We disagree.

The testimony of Scherl, her husband, and her father-in-law establishes SASCO's actions profoundly affected her. She cried every day for over a month and was unable to leave her house. For at least two months after her discharge, she experienced daily headaches, nausea, and sleeplessness. Her emotional state alternated between anger and self-doubt. She became depressed and felt as if her life had been taken away from her. She felted betrayed and embarrassed to the point where she avoided her boating colleagues.

The evidence further establishes SASCO's actions profoundly affected Scherl's marriage. She stopped trusting her husband because he told her "everything would be okay regarding the pregnancy and it wasn't." They lost much of their physical intimacy and she has contemplated divorce because she is afraid of getting pregnant again. The financial pressure of losing her income caused them to argue about things they would not normally argue about. In addition, their home phone was disconnected, they had to borrow money from his parents for health insurance and rent, and at times they had to scrape together change to afford food. Further, their lack of adequate financial resources caused Scherl to worry about how she would provide health insurance for her new baby who was born with a heart murmur. This evidence amply supports the Commission's award. (See *Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 812, 821–822 [89 Cal.Rptr.2d 505] [award of over $450,000 in emotional distress damages supported by testimony of employee and wife that employer's retaliation impaired employee's relationship with his wife and children and caused him to experience physical symptoms, become withdrawn and weepy, have trouble paying bills, and worry about providing private schooling for his children].)

### D. *Administrative Fine*

■ Finally, SASCO contends the Commission's decision to impose an administrative fine is not supported by sufficient evidence.[7] The imposition of an administrative fine requires clear and convincing evidence of oppression, fraud, or express or implied malice. (Gov. Code, § 12970, subd. (d).) " 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) " 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(2).) In determining whether to impose an administrative fine, the Commission considers whether the employer's conduct was willful, intentional, or purposeful; the employer refused to prevent or eliminate discrimination; the employer consciously disregarded

---

[7] SASCO contends the superior court incorrectly reviewed this point under the substantial evidence test because the underlying standard of proof was clear and convincing evidence. As we explained in footnote 5, *ante*, our review is of the Commission's decision and findings, not the superior court's. Moreover, our review is the same (substantial evidence test) regardless of the standard of proof before the Commission. (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750 [106 Cal.Rptr. 187, 505 P.2d 1027]; *In re Marriage of Ruelas* (2007) 154 Cal.App.4th 339, 345 [64 Cal.Rptr.3d 600]; *In re Marriage of Murray* (2002) 101 Cal.App.4th 581, 604 [124 Cal.Rptr.2d 342].)

its employee's rights; the employer's conduct was unlawful; the employer engaged in intimidation and harassment; the employer's conduct was without just cause or excuse; and the employer violated FEHA multiple times. (Gov. Code, § 12970, subd. (d).)

As we explained in part IIIA., *ante*, the evidence in this case establishes SASCO intentionally discriminated against Scherl by terminating her employment because she was pregnant. The evidence also establishes SASCO contrived a reduction in force to hide its discrimination. Before McIntyre terminated her employment, McIntyre told Best he would need to hire a new deckhand because Scherl could not go to Mexico. This conversation occurred within a day or so after McIntyre learned of her pregnancy and well before Jordan e-mailed McIntyre of the need to reduce the yacht's staff.

Moreover, until Jordan learned of Scherl's pregnancy there was no indication SASCO contemplated a reduction in the yacht's budget or staffing. SASCO's other layoffs ended almost a year earlier and, notwithstanding those layoffs, SASCO hired Scherl as a full-time employee and purchased a second fishing boat. In addition, the month before Jordan sent his e-mail, McIntyre changed Best's status from independent contractor to full-time employee. It makes little sense for SASCO to have approved Best's change of status if the yacht's budget was in flux and a staffing reduction was being contemplated.

Furthermore, as a practical matter, Scherl was the only SASCO employee affected by the reduction in force. Although McIntyre purportedly laid off Jane at the same time he laid off Scherl, Jane returned to work a week later with the same work hours and same duties. Her pay was simply categorized as a different type of expenditure. Conversely, when McIntyre had the opportunity to recall Scherl, first as an independent contractor to help with the Mexico trip and then as a full-time employee to replace Best, he did not do so even though, at that time, he was unaware of any potential restrictions on Scherl's ability to work. Instead, he hired two people who had far less experience than Scherl.

As we explained in part IIIC., *ante*, Scherl suffered significant emotional distress and financial hardship because of SASCO's conduct. Accordingly, we conclude there is substantial evidence to support the Commission's finding that there was clear and convincing evidence of oppression and malice on SASCO's part.

## DISPOSITION

The judgment is affirmed. The Commission is awarded its costs on appeal.

Nares, J., and McIntyre, J., concurred.