Filed 1/23/14  Hughes v. Cal. Dept. of Corrections and Rehabilitation CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CHARLES HUGHES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS & REHABILITATION,<br><br>    Defendant and Appellant. | B238134<br><br>(Los Angeles County<br>Super. Ct. No. BC355143) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Terry A. Green, Judge.  Affirmed.

Kamala D. Harris, Attorney General, Alicia B. Fowler, Senior Assistant Attorney General, Jerald Mosley, Supervising Deputy Attorney General, Gabrielle H. Brumbach and Bruce W. Reynolds, Deputy Attorneys General, for Defendant and Appellant.

Law Offices of Stephen J. Horvath, Stephen J. Horvath, Marcus J. Berger; Benedon & Serlin, Douglas G. Benedon, and Gerald M. Serlin for Plaintiff and Respondent.

# INTRODUCTION

A jury found in favor of plaintiff and appellant Charles Hughes (plaintiff) on his cause of action for retaliation under the Fair Employment and Housing Act (FEHA)[1] and awarded him damages in the amount of $1,670,393.37. On appeal, defendant and respondent State of California Department of Corrections and Rehabilitation (the Department) contends that there was insufficient evidence to support the jury's finding of retaliation, the trial court failed to instruct the jury properly on plaintiff's burden to prove retaliatory intent, the damage awards for back pay and overtime were improper, and there was insufficient evidence to support the noneconomic damage award.

We hold that there was substantial evidence to support the jury's finding of retaliation under FEHA, the trial court properly instructed the jury on plaintiff's burden to prove retaliatory intent, the jury properly awarded damages for back pay and overtime, and there was sufficient evidence to support the noneconomic damage award. Therefore, we affirm the judgment in favor of plaintiff.

# FACTUAL BACKGROUND[2]

## A. Plaintiff's Employment With the Department

Plaintiff began his employment with the Department as a correctional officer in 1994. In 2000, plaintiff was promoted to the rank of correctional lieutenant. In 2004 and 2005, at the time of the incidents that gave rise to this action, plaintiff was assigned as a

---

[1]  Government Code section 12920 et seq. Plaintiff's retaliation claim was pleaded under section 12940.

[2]  Pursuant to the substantial evidence standard of review discussed below, we state the facts in a light most favorable to the verdict, indulging all reasonable inferences and resolving all conflicts in favor of the verdict. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.)

correctional lieutenant to California State Prison Los Angeles County (Los Angeles County state prison) located in Lancaster.

While employed at the Department, plaintiff was a member of the correctional police officer's union. In 1995, he became a job steward. In that capacity, he represented union members in "lower-level grievances . . . [and] small internal affairs interviews." In 1998, plaintiff was elected chapter president of the union, a position he held at the time of the incidents in question. In that position, he "interface[d] with the warden [and] high-level managers . . . ." He also handled "high-level internal affairs interviews" and "high-level disciplinary cases, such as terminations."

## B.      Protected Activity

### 1.      *Plaintiff's Activities Concerning the Department's Racial Segregation of Inmates*

In November 2004, plaintiff read a Los Angeles Times newspaper article about oral arguments before the United States Supreme Court in the Garrison Johnson case.[3] Based on the content of the article, plaintiff had discussions with other union representatives because he knew, based on his experience, that the Department's representation to the Supreme Court—that it only segregated inmates for the first 60 days from reception—was not true. Plaintiff then spoke to a news reporter at the Press Enterprise and told her that "what [the Department's attorneys] were saying [to the Supreme Court was] absolutely not true and that [the Department] use[d] race all the time . . . past the 60 days from reception." He told the reporter that he believed "the Department was lying" about racial segregation in the California prison system.

---

[3]      According to the parties, the case plaintiff read about in the newspaper was *Johnson v. California* (2005) 543 U.S. 499 (the *Johnson* case) which held that the Department's policy in segregating inmates by race at reception was subject to strict judicial scrutiny under the United States Constitution.

After speaking to the reporters, plaintiff met with Warden Charles Harrison and requested any written policies that the Department followed concerning the racial segregation of inmates. He also told the warden about his conversation with the newspaper reporter. Plaintiff then had a similar conversation with Chief Deputy Warden Montero and Lieutenant Frank. He was informed that the Department did not have any written policies concerning the racial segregation of inmates.

Following plaintiff's interview with the reporter, a newspaper article was published that accurately stated plaintiff's experience regarding the racial segregation of inmates in the California state prison system. Plaintiff was quoted in the article as saying, "There's no way I put a black and a white together [in the same cell]."

Sometime after the newspaper article was published, plaintiff was notified that State Senator Gloria Romero was convening a Senate hearing and he was asked to testify. According to plaintiff, he agreed to testify because "[w]ith this issue, [he] really had a very serious concern with [his] Department because [correctional officers did segregate], and [the Department was] lying about [the segregation policy] to . . . the United States Supreme Court. [¶] And [he] thought, 'wait a minute. If [the Department's lawyers] have to lie about what [correctional officers] do, maybe [the officers] shouldn't be doing this.' [¶] And [he] had a big concern that because there weren't written policies, because [correctional officers did] this every day and [the Department's lawyers were] lying to the United States Supreme Court and trying to cover this up—[correctional officers were] the guys that [were] doing this. [He did] it every day so, . . . [he] had deep concerns [that] '[correctional officers] shouldn't be doing this. And if [the Department had] to lie about it, then there [was] a big problem.' [¶] And that came from [his] experience . . . as a correctional counselor and as a lieutenant, so some other guys had big concerns about the code of silence, and [he] had that concern as well. That was a major concern. [¶] But [he] looked at it a little bit different, too, because of [his] experience—because most of those guys are just officers. [¶] [He] had the counselor experience and lieutenant experience. [He] was the guy who [was] actually [racially segregating inmates], and [he] had a big concern about doing that because [the Department was] lying about it."

At the state Senate hearing, plaintiff told the truth about the Department's racial segregation of inmates. Specifically, he testified about "how at Lancaster [correctional officers] racially segregate past the 60-day mark. [¶] [The Los Angeles County state prison was] not a reception center. [It was] a general population housing unit, and [correctional officers at the facility did] intake people from reception and transfers, and [did] . . . what [the Department] said [they] didn't do." A Department Director, Jeanne Woodford, attended the Senate hearing, as did Bruce Slavin from the Department's office of legal affairs.[4]

### 2. *Plaintiff's Activities Concerning the Comedy Show*

In May 2005, representatives of HBO approached the public information officer for the Los Angeles County state prison about performing a comedy show at that facility. The public information officer informed Warden Harrison that comedy shows had been performed twice before at a different facility. The warden approved the performance without reviewing the content in advance. Warden Harrison attended the performance, which included the use of inappropriate language. According to the warden, the comedians "hit upon all ethnic groups and all genders, poking fun at everybody." He did recall that sexual props were used during the show, including a "dildo" and "fake breasts."

Warden Harrison attended the entire show and laughed at times during the performance. But, during the course of the performance, the warden recognized that "there were terms said or things said that [he] wish[ed they] had known in advance . . . [so he] could have cautioned against them." He considered shutting down the performance, but "elected to finish the comedy show." He recalled thinking that the

---

[4] As explained below, the hiring authority and decisionmaker for the two notices of adverse action issued in connection with the first and second terminations of plaintiff was Michael Knowles. Although Knowles denied that he was aware of plaintiff's activities in connection with the state Senate testimony, he attended weekly meetings at which the *Johnson* case and the segregation issue were discussed.

content could be offensive to some people, and specifically recalled a comment that could have been offensive to female staff.

Sergeant Alfred Salazar was on duty and present during the comedy show. Three to five minutes into the performance, Salazar "felt a hostile work environment." During the show he witnessed "a lot of sexual harassment and racial discrimination slurs/language . . . ." Warden Harrison was present, as was Captain Wofford, but nothing was done to stop the performance. Salazar "was really bothered" by the show, and he spoke to other staff members who "were [bothered] as well."

Because Salazar feared retaliation if he complained about the show, he initially did nothing in response to it. Seven or eight days after the show, however, he contacted plaintiff, who was his union representative, and plaintiff advised him to write a report detailing his concerns about the show. Plaintiff, who had not heard about the comedy show until he spoke to Salazar, was "absolutely shocked" when he read Salazar's report, and he reported the incident to his superiors as required. He wanted his entire chain of command to be aware of the incident at the prison.

On May 16, 2005, during a management meeting, Associate Warden Downs referenced certain adverse employment actions then pending against plaintiff. According to several persons who attended that meeting, Downs made comments about plaintiff, such as "We got him . . . they will string him up," "We have him up against the wall," "[Plaintiff's] ass would be nailed against the wall," and "I think the reason [plaintiff] is attacking this administration is due to the fact that he has sustained adverse action with another one coming that will nail his ass to the wall . . . ."

No one in the chain of command contacted plaintiff in response to his reports about the comedy show, but he was contacted by the Department's office of civil rights. Kathy Salas from that office conducted an intake interview with plaintiff in August 2005. Following that interview, the office of civil rights began an investigation of the comedy show. In October 2005, Salas interviewed plaintiff again. He told Salas what Salazar had told him about the comedy show and discussed his concerns about retaliation. Although Salas concluded "that the comedy show violated equal employment opportunity

6

rules and regulations, as well as the [Department's] rules and regulations regarding sexual harassment and discrimination," and that discrimination and sexual harassment definitely occurred during the comedy show. She did not investigate plaintiff's complaint about retaliation. She also determined that plaintiff's complaint about the comedy show constituted protected activity. The office of civil rights found that Warden Harrison was responsible for allowing the comedy show to take place, and he received disciplinary action for that decision. Warden Harrison left the Los Angeles County state prison in November 2005 and accepted a position as associate warden at the state prison facility in Norco.

## C.      Terminations

### 1.      *First Termination*

According to plaintiff, on September 10, 2004, he was working as the watch commander. While he was in the warden's office with Lieutenant Henderson, plaintiff heard a radio call about a serious incident. Plaintiff and Henderson left the warden's office and proceeded to the area of cell 149, where he observed a group of correctional officers. Inside the cell, he saw an inmate lying face down in a pool of blood. It appeared to plaintiff that an inmate had been murdered. Medical staff were in the cell with the inmate.

Plaintiff began to take control of the crime scene. Two investigative officers were at the scene taking photographs and "telling people to clear the area." Plaintiff assisted the investigators as they "isolate[d], contain[ed], and control[led] the area." He cleared "people from the area outside the cell." To help gain control of the crime scene, plaintiff directed a squad officer to "place crime scene tape to delineate the area of the crime scene."

About 10 minutes after plaintiff arrived at the crime scene, medical technical assistant Brenda Wimbish arrived in civilian clothing. As she approached the tape, plaintiff directed her to stop. Two other medical assistants were already performing CPR

on the victim. According to plaintiff, he and Wimbish "went back and forth a couple of times. [But o]nce [he] figured out that she wanted the inmate transferred or moved, [he] immediately turned to . . . Officer Ellis . . . and instructed him to go in there and help transport the body." Ellis assisted the two medical assistants in removing the inmate from the cell and transporting him out of the building.

Based on plaintiff's experience, he believed the inmate was dead.[5] He told his custody staff, "slow down, chill out. He's dead." Plaintiff later told investigators that he did not remember if Associate Warden Fakhoury ordered him to allow Wimbish access to the scene. Plaintiff recalled interacting with the associate warden at the scene, but did not remember what had been said.

In September 2004, Brenda Wimbish was a senior medical technical assistant at the Los Angeles County state prison in Lancaster. On September 10, she was in her office in the central infirmary when she was informed that there was a nonresponsive inmate in the administrative segregation area who was en route to the triage treatment area or emergency room. She went to the emergency room and waited for the inmate patient to arrive. Doctors were present, and she was asked numerous times, "What's taking them so long, why isn't the patient here?" Wimbish was informed that the inmate patient was nonresponsive and medical staff at the scene were not being allowed to transport him.

Wimbish, along with other medical and custody staff, proceeded to the scene where she saw plaintiff and a security squad that was taking photographs. When Wimbish went "underneath the taped-off area," plaintiff informed her that she "was impeding a crime scene and directed [her] to leave." She told plaintiff they were waiting in the emergency room for the patient. Plaintiff told her, "Chill out, Wimbish, the patient is dead." Wimbish told plaintiff he was placing the inmate patient's life in jeopardy and exposing the Department to possible litigation. Plaintiff again directed Wimbish to leave the crime scene.

---

[5]     The coroner estimated that the inmate may have been dead as long as four hours before officers discovered his body.

Lieutenant Walton told Wimbish to speak with Associate Warden Fakhoury who was also on scene. Wimbish explained to the associate warden that there were no medical staff in the building who were qualified to pronounce the inmate dead and that qualified medical staff were waiting for the inmate in the emergency room. The associate warden immediately directed the custody staff to allow the medical staff to transport the inmate to the emergency room, which they did.

As a result of the incident, Wimbish wrote a memorandum detailing the incident with plaintiff. She wrote the memorandum because custody staff had impeded medical staff in rendering medical services, which she considered a serious issue that needed to be addressed by "a higher administration."

Based on Wimbish's memorandum, Warden Harrison made a written request for an internal affairs investigation on January 13, 2005, i.e., four months after the incident. According to the request, plaintiff violated the "Emergency Medical Response Protocol" by denying Wimbish access to the inmate patient and making an unauthorized determination that the inmate was dead.

On January 31, 2005, internal affairs special agent Richard Cortez was assigned to conduct the investigation requested by Warden Harrison. Cortez began witness interviews in July 2005. According to plaintiff's wife, on the evening of July 19, 2005, Cortez called plaintiff at home concerning service of a notice of hearing. Plaintiff told Cortez not to come to his home and instead to serve the notice on him at work. Shortly thereafter, at around 9:00 p.m., Cortez knocked on plaintiff's door and "just ended up coming in." Plaintiff's wife was angry, and her children were scared. Plaintiff's wife called the prison the next day and complained. She also filed a written complaint about the incident. Two of plaintiff's experts opined that Cortez should have recused himself from the investigation based on the complaint. Cortez received a written admonition, but was not removed from the investigation.

During the course of his investigation, Cortez interviewed 34 witnesses and attached 50 exhibits to his final investigation report. The report listed four allegations of misconduct by plaintiff: (1) he violated the "Emergency Medical Response Operational

9

Procedure" when he ordered Wimbish out of the crime scene after she had responded to the scene to arrange the transfer of the inmate to the infirmary; (2) he made an unauthorized medical assessment of the inmate when he told Wimbish to "Chill out he is already dead" and "'He's dead, there is nothing we can do;'" (3) he ordered two other responding medical technical assistants out of the crime scene, thereby preventing them from assisting the medical assistants already on scene; and (4) he was dishonest when he stated in his internal affairs interview that the associate warden did not order him to allow Wimbish access to the inmate. The report concluded by referring the matter to the hiring authority.

Although Cortez's final report reflected that plaintiff allegedly violated the Department's medical emergency response policy, the report failed to disclose that plaintiff had not been trained in that policy. Moreover, the report did not disclose that Cortez had interviewed Gerardo Cardenas, an in-service training officer, who confirmed that plaintiff had not been trained in that policy. Cardenas also confirmed that, if plaintiff had been trained in that policy, it would have been reflected in plaintiff's training log, which documentation was available for review by internal affairs investigators.

As to the allegation of dishonesty, Cortez's report, which was required to identify the evidence in support of each allegation, did not cite as evidence the statement plaintiff made to investigators concerning whether Associate Warden Fakhoury had instructed plaintiff to allow Wimbish access to the inmate patient. Specifically, the report did not disclose that during an internal affairs interview of plaintiff he was asked, "Why would [Associate Warden Fakhoury] say he told [you] to back off so [medical staff] can move the inmate out [of the cell]?" Plaintiff responded by explaining "I don't' know why [Associate Warden Fakhoury] would say it. You have to ask [him]. I could tell you that I never heard that."

Cortez's report was forwarded to Deputy Director Michael Knowles to make the final decision concerning plaintiff's termination.[6] One of plaintiff's experts explained

---

[6]     Knowles confirmed that he made the decision to terminate plaintiff.

that, as the hiring authority, Knowles was required to review the investigative report and determine if "there is sufficient evidence to support a possible adverse action." That expert also stated that each allegation of misconduct set forth in the report was to be followed by bullet points detailing the evidence in support of the allegation. Knowles recognized that the allegation of dishonesty in the report was not supported by a bullet point specifying the statement or statements plaintiff made to the investigator that were dishonest, but he nevertheless sustained the dishonesty allegation on the assumption that the allegation was true.

Based on Knowles's decision to terminate plaintiff, the Department sent him a notice of adverse action dated October 19, 2005, advising plaintiff that he was dismissed from his position of correctional lieutenant effective November 1, 2005.[7] That notice included the allegation of dishonesty based on plaintiff's alleged denial to the internal affairs investigator that Associate Warden Fakhoury ordered him to allow Wimbish access to the inmate patient.

On November 24, 2005, Knowles issued a modified notice of adverse action setting the effective date of plaintiff's termination as December 13, 2005. That notice again set forth the allegation of dishonesty contained in the initial notice, but included two additional allegations of dishonesty: (1) plaintiff denied in his internal affairs interview that he gave medical staff any directions on the date of the incident in question; and (2) plaintiff asserted in that same interview that he would never impede medical staff from entering a crime scene to treat an injured inmate. Those allegations were not in the internal affairs report and were not the subject of plaintiff's Skelly hearing.[8]

---

[7]  The initial notice of adverse action was signed by Derral Adams, associate director, southern section.

[8]  "Skelly hearing" refers to the administrative hearing required by *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194 [state statutory scheme regulating civil service employment recognizes that a permanent civil service employee has a property interest in continued employment that is protected by due process].

11

## 2. *Second Termination*

When Hughes was elected chapter president of the union in 2004, correctional officer Eric Stanback was elected vice-president. Soon after the election, in January 2005, Stanback started a recall election against plaintiff. Stanback accused plaintiff of stealing money from a nonprofit organization that plaintiff ran[9] and asked officers to sign a petition to have plaintiff recalled. In March 2005, plaintiff called Stanback and said, "Do you remember Reno, do you remember where we went in Reno?" According to plaintiff, he was referring to an incident that occurred at a union convention in Reno. During that convention, Stanback asked plaintiff to accompany him to a brothel where plaintiff, who was married, "had a drink and . . . Stanback partaked [*sic*] in the activities . . . ." Plaintiff was off duty when he called Stanback, and the call related to union activities, not his job as a correctional lieutenant. Three other union members were in the car when plaintiff called Stanback.

Two days after the telephone call, Stanback submitted a memorandum to Warden Harrison complaining about the call. According to Stanback, in addition to referencing the brothel in Reno, plaintiff also stated, "I'm Charles Hughes, and I'll get you."

The following month, after Stanback had been absent from union meetings, plaintiff, while off duty, telephoned Stanback's supervisor, Sergeant Eltzroth, and informed him that because Stanback had been removed as a union job steward, he should not be given permission to leave his post to attend a union meeting scheduled for that day, unless he took time off and made arrangements to cover his post.

Based on that telephone call, Stanback was denied permission to leave his post and, at the union meeting later that day, he was temporarily removed as vice-president for failing to attend union meetings. In response, Stanback immediately sent Warden Harrison a memorandum complaining that plaintiff misused his position as lieutenant to prevent Stanback from attending the union meeting.

---

[9] Plaintiff managed a nonprofit organization named the California Staff Assault Task Force that provided assistance to correctional staff who had been assaulted by inmates.

Based on Stanback's complaints about plaintiff, Warden Harrison submitted a request for investigation to internal affairs senior special agent Linda Hidy on May 10, 2005. But Hidy rejected the Warden's request because she determined that the alleged misconduct involved supervisory issues that did not warrant an internal affairs investigation of misconduct. Warden Harrison then contacted his supervisor, regional administrator Wendy Still, who decided to resubmit the request for investigation to internal affairs.[10] Hidy, however, again rejected the resubmitted request. Internal affairs rejected the requests because the allegations against plaintiff were based on his off-duty union activity.

By a memorandum to the Department's internal affairs assistant secretary, Still requested that the allegations against plaintiff be reconsidered. Thereafter, the Department's Sacramento headquarters ordered Hidy to accept the investigation requests concerning plaintiff. Hidy therefore approved the investigation requests and assigned internal affairs investigator Gene Pettit to conduct the investigation.

During Pettit's internal affairs interview of him, plaintiff denied that he said "I'll get you" to Stanback during the telephone call about the Reno incident. Plaintiff also identified three witnesses who would corroborate that plaintiff did not say "I'll get you" to Stanback in the telephone call. Pettit, however, did not interview those three witnesses.

To support his complaint about being removed as union vice-president, Stanback provided Pettit with one page from the union minutes showing that Stanback had been removed from his position on the union's board of directors. But Pettit did not obtain a complete copy of the minutes which reflected that during the same meeting, plaintiff restored Stanback to the union's board.

---

[10]     Still knew about plaintiff's testimony before the state Senate and the comedy show.

13

On November 4, 2005, Pettit forwarded his investigation report to the hiring authority Knowles.[11] The report set forth six allegations of misconduct against plaintiff, including the two incidents discussed above involving Stanback, i.e., the telephone call to Stanback about the Reno incident and the telephone call to Eltzroth advising him to deny Stanback permission to attend a union meeting. Pettit included summaries of his interviews of 10 witnesses, including a summary of his interview of plaintiff, and attached 20 exhibits to his report.

When Knowles reviewed Pettit's report, it did not contain any specific allegation of dishonesty against plaintiff. Nevertheless, based on that report, Knowles issued a notice of adverse action[12] that included two allegations of misconduct, including a new allegation asserting dishonesty against plaintiff. The first allegation was based on plaintiff's telephone call to Stanback about the Reno incident. The second allegation was based on plaintiff's conversation with Eltzroth during which he advised Eltzroth not to grant Stanback time off to attend the union meeting. But that second allegation further alleged that plaintiff had been dishonest when he told Eltzroth that Stanback had been removed from his position with the union because the union did not remove Stanback as vice-president until after the conversation between plaintiff and Eltzroth.

In making his decision to terminate plaintiff based on, inter alia, the newly added dishonesty allegation, Knowles was aware that plaintiff had told Pettit during the internal affairs interview that when plaintiff spoke to Eltzroth, he advised him that he had removed Stanback from his job steward position, not his position as vice-president. Nevertheless, Knowles found by a preponderance of the evidence that plaintiff falsely represented to Eltzroth that Stanback had been removed as vice-president.

---

[11]     Knowles admitted that he was the hiring authority and "the decisionmaker" for the second termination.

[12]     Knowles signed the notice of adverse action for the second termination on December 7, 2005, but it apparently was not served on plaintiff or distributed until March 1, 2006.

14

On November 14, 2005, Knowles sent a letter notifying plaintiff of Knowles's decision to terminate him. Although the letter stated that "formal Adverse Action papers" would be served within 30 days, the formal notice of adverse action attaching Pettit's report and exhibits, i.e., the Skelly package, was not sent to plaintiff until March 1, 2006. That notice stated that plaintiff had been terminated effective January 2, 2006, notwithstanding that plaintiff's first termination was effective December 13, 2005. Plaintiff's expert opined that he was unaware of any authority that would allow the Department to terminate an employee who had already been terminated.

Plaintiff was not given a Skelly hearing on the second termination until April 11, 2006. The hearing officer, Chief Deputy Warden Linda Schulties, recommended to Knowles that the second termination be upheld, despite her admission that she had never recommended firing a former employee who had already been fired. Schulties believed that the second termination was necessary in the event the first termination was overturned. The Department notified plaintiff of its final decision to impose the second termination on May 30, 2006. Although Knowles acknowledged that he was the hiring authority and decisionmaker for the second termination, the Department's letter asserted that Deputy Director Scott Kernan had made the final decision.

### D.    State Personnel Board Appeals

Plaintiff appealed both of his terminations to the state personnel board (board). Following a hearing before an administrative law judge on the first termination, the board adopted the judge's findings and decision that reversed plaintiff's termination. According to the adopted decision, "[the Department] failed to prove by a preponderance of the evidence any of the causes for discipline alleged against [plaintiff]." The adopted decision ordered as follows: "The action of the appointing power dismissing [plaintiff] from his position as a Correctional Lieutenant is revoked. Jurisdiction is reserved in the event the parties are unable to agree to back salary, benefits, and interest due [plaintiff] under the provisions of Government Code section 19584."

15

Following a hearing before an administrative law judge on the second termination, the board adopted a resolution ruling that the appeal from the second termination was dismissed on the grounds that the board had no jurisdiction to hear an appeal from a dismissal that was "void and of no effect." According to the board's adopted resolution, "a dismissal is a permanent separation from state service, and . . . appellant was not a state employee at the time of the [second termination] . . . ." Accordingly, the board concluded that the second termination "imposed upon [plaintiff] with the effective date of January 2, 2006 [was] deemed null and void and the appeal therefrom [was] dismissed."

### E. Damages

Plaintiff's economic expert calculated that plaintiff suffered economic damages in the form of lost wages and overtime in the amount of $448,856.98. According to plaintiff, the two terminations caused him to suffer emotional distress and physical injury. "Q. Did the stress affect your health in any way? A. Yeah. After I was fired, I went to the doctor and it was a while after I was fired, and it was just building up, and I was—I had to get put on diabetes medicine, high blood pressure, cholesterol meds. I couldn't sleep, so I got some sleeping meds, medications, and I just jumped right into trying to defend myself and trying to get my job back, which at the end it was successful, but it was a long road and a lot of hearings and, you know, it took a lot of work to undue what they did in the sense of my job and getting it back, and I did."

Plaintiff also believed that the two terminations damaged his reputation. "Q. What about your reputation? Do you feel that it affected your reputation? A. Yeah, I was publicly fired and really where that I think really—I think it affected my family more. My daughter Ashley, she would get teased and they'd say, you know, you're poor now and your daddy got fired and they actually did—I was the current events. My news articles about being fired was their current event in their class and the teachers assigned those out. It's pretty amazing."

And plaintiff believed that the two terminations damaged his career. "Q. And do you believe that you suffered harm to your career? A. I've done really well taking tests

and promoting and I—as I testified, I went [up] on both sides, the union side, and I've went up the Department side, number one ranked lieutenant in the state, but I think that side is pretty much done. In fact, I don't—I actually don't even think I'm going to be a lieutenant much longer because—I mean, a lieutenant is a very responsible job, and you've got a lot of responsibilities, and I believe they're going to do this to me again, it's just a matter of time, but I'm going to go back to work and do what I can do." [¶] . . . [¶] Q. And do you have any feelings about your ability to promote in the future? A. I don't believe there's going to be any possibility of promoting."

Plaintiff's wife also believed that the two terminations had caused plaintiff to suffer emotional distress and physical injury. "How [the two terminations] affected my husband, he has always been a busy—he's always been very busy. But he was—the stress was not there. He was able to work overtime, come home and sleep very well [at] night. [¶] After the terminations, he became a different person. He—it was just extremely stressful. He no longer was able to leave his work outside of our home, because before he was able to work 6:00 to 2:00, or even a double, come home, and he would leave everything right at work. [¶] Now, with the terminations, he, obviously, brought them home. He was extremely stressed. He was not sleeping at night. He went to the doctor and got sleeping pills. They didn't work. He had to get more. He had high blood pressure that he didn't have before. He started eating a lot more, because he was just stressed. [¶] And, as a wife, I was, honey, but then he just was so stressed. He just would eat. He'd go to the doctors. He ended up with diabetes—he ended up with high blood pressure, diabetes, high cholesterol, after this started. [¶] So the long hours, I know that a lot of people work long hours and, maybe, commute, but it was very separate. It wasn't the same kind of stress that he constantly was in. He would come home, he would constantly be reading documents like this, in our home. So that's what my kids saw. My kids didn't just see a dad who just went to work and came back. They saw him obsessing over documents. [¶] And when my kids would approach him, he would be very grumpy, and he would say, not now, not now, now is not a good time. Or he would—they would try to talk to him and he would be—because he would be home,

17

obsessing over this, and he would say, now is not a good time, or, come back later, or—
so he just became a different—a different person."

Plaintiff's medical expert opined that the stress from the two terminations caused plaintiff to develop medical conditions and also aggravated existing conditions. "Q. Okay, well, can you explain to the jury these ailments that you identified and how stress—how they're related to stress. A. There were four different ailments that [plaintiff] suffers from. The first were digestive problems. These predated his stressors with the [Department]. And he had been on over-the-counter Tums for some years, which began in or about 2003. So he has reflux, or heartburn; a condition, again, that preexisted the stress. [¶] Through and after the stress, this condition worsened, per [plaintiff], and now actually requires, or did require in or about 2005, treatment with prescription medication, including something called Nexium. [¶] So the symptom was there before and then was aggravated after these stresses. And the relationship there is that with stress comes increased adrenaline, comes increased acid production, hydrochloric acid to the stomach. [¶] If someone has reflux where acid comes back up, as most of us have felt, increased stress both subjectively and objectively increases the acidity that one would perceive. And that would be the injury with regard to the digestive system. [¶] The second would be with regard to [plaintiff's] diabetes. Although diabetes is a process that takes years to develop, it was first diagnosed in or about 2007. So there was no evidence of diabetes documented in the medical records until and after he was evaluated by another physician. And that was also documented in the Kaiser records. So the first documentation there was in 2007, about August of that year. And, therefore, there was no preexisting diabetes, although there can be a preexisting tendency towards diabetes. [¶] There again, stress is well-documented in the medical literature to be associated with the development over aberration of diabetes, just as other risk factors can be, such as weight, such as cigarette smoking, etc. [¶] So we went from somebody with no diabetes to being diagnosed with diabetes. And the medical literature substantiates the fact that these are not just coincidental findings, but in a given case can be actually causally related. [¶] Number [three] was sleep disorder.

18

[Plaintiff] had a history of what is called sleep apnea, dating back to approximately the early 2000's. [¶] And sleep apnea is a process by which there is haphazard disordered breathing or even stoppage of breathing during sleep. It can be related to a number of things, some of which can be traumatic; some of which are related to weight. [¶] In [plaintiff's] case, this was, again, documented several years prior. So this is a preexisting condition in terms of a sleep disorder. [¶] However, [plaintiff] also had a surgery, which was a repair of his tonsils and the pharynx area, which, according to him, gave a significant improvement. And that surgery was done about May of 2004. And his sleep[less]ness improved at that time. [¶] Subsequently, [plaintiff] developed further sleep disturbances based on his psychologic stress related to the processes that were going on as a result of his employment. And that progressed to the point that he was placed at Kaiser on Ambien, which is a sleep medication, absent which he had extreme difficulty sleeping. And no sleep study has been performed in the recent past. [¶] Therefore, he had a preexisting sleep disorder, with improvement after surgery, which has now deteriorated again after these stresses, which have caused him to develop again irregular sleep. [¶] And the last was hypertension. Again, first diagnosed in about 2007, several years after his stressors began, was diagnosed by several industrial physicians, and has been treated with medication since that time." Plaintiff's expert further concluded that plaintiff's medical conditions would require future care and treatment.

## PROCEDURAL BACKGROUND

Plaintiff filed a first amended complaint against the Department and several of its individual employees asserting causes of action for: (1) discrimination, harassment, retaliation under FEHA; (2) wrongful termination in violation of public policy; and (3) intentional infliction of emotional distress. Following two defense summary judgment motions, the case proceeded to jury trial against the Department only on the FEHA retaliation claim. In a special verdict, the jury found in favor of plaintiff on his retaliation claims based on his protected activities of testifying before the state Senate on racial

19

segregation and complaining about the talent show.  The jury concluded that the Department was aware of those protected activities before imposing the first and second terminations, plaintiff's protected activities were a motivating reason for those adverse employment actions, and the Department's retaliation was a substantial factor in causing injury to plaintiff.  The jury awarded plaintiff damages in the total amount of $1,670,393.37 comprised of $233,172.06 in lost earnings, 187,221.31 in lost overtime earnings, $1,000,000 for past noneconomic loss, and $250,000 for future noneconomic loss.

## DISCUSSION

### A.     Substantial Evidence

#### 1.     *Standard of Review*

The Department's challenge to the sufficiency of the evidence in support of the jury's finding of retaliation is governed by the substantial evidence standard of review. "'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below.  [Citation.]  We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court.'  [Citation.]" (*Bickel v. City of Piedmont, supra,* 16 Cal.4th at p. 1053.)

#### 2.     *Legal Principles*

"Past California cases hold that in order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and

20

(3) a causal link existed between the protected activity and the employer's action. (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 814-815 [89 Cal.Rptr.2d 505]; *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476 [4 Cal.Rptr.2d 522] [adopting the title VII (Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.) burden-shifting analysis of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802-805 [36 L.Ed.2d 668, 93 S.Ct. 1817]].) Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 68 [105 Cal.Rptr.2d 652].) If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ""'drops out of the picture,''" and the burden shifts back to the employee to prove intentional retaliation. (*Ibid.*)" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

### 3. *Protected Activity*

Although the Department concedes that plaintiff's complaints about the comedy show constituted protected activity under FEHA, it contends that his testimony before the state Senate did not constitute protected activity. According to the Department, in his testimony before the state Senate, plaintiff was complaining that the Department's lawyers were lying to the Supreme Court about its segregation policies, and complaints about lying do not constitute protected activity.

In the special verdict, the jury found that plaintiff's state Senate testimony constituted protected activity, and substantial evidence supported that finding. Plaintiff's trial testimony, when read in light of the substantial evidence standard of review, supported a reasonable inference that he was not just concerned about the Department lying about its racial segregation policy, but also about the legality of that policy and the ramifications of his participation in the enforcement of that policy, as well as the participation of other correctional officers. Specifically, plaintiff testified at trial that the fact the Department was lying about the policy concerned him and other officers because they were segregating inmates based on race "every day" and he "was the guy who [was]

21

actually [racially segregating inmates], and [he] had a big concern about doing that because [the Department was] lying about it." Plaintiff further testified that "[i]f [the Department's lawyers] have to lie about what [correctional officers] do, maybe [the officers] shouldn't be doing this."

Under FEHA, an employer's policy requiring an employee to racially discriminate as a term or condition of employment is an unlawful employment practice. (See *Moyo v. Gomez* (9th Cir. 1994) 40 F.3d 982, 985 [if employee can show that he was discharged for refusing to carry out or otherwise protesting the defendant's policy of racial discrimination against inmates, the employee states a claim based upon an unlawful employment practice].) Based on plaintiff's trial testimony concerning his reasons for testifying before the state Senate, a reasonable juror could have concluded that his state Senate testimony was protected activity under FEHA because it could fairly be construed as a complaint about or protest against being required, as a condition of employment, to engage in illegal activity. Therefore, substantial evidence supported the jury's finding that plaintiff's state Senate testimony was protected activity under FEHA.

The Department contends that plaintiff's belief that the Department's segregation policy was illegal was not objectively reasonable because inmates are not employees of the Department and, thus, its policy of segregating them could not be an employment practice under FEHA. But, as explained above, plaintiff's testimony, although not perfectly clear, supported a reasonable inference that the employment practice about which plaintiff was complaining was the Department, as a term or condition of his employment, requiring him and other correctional officers to, in effect, segregate inmates based on race. Under FEHA, that is an unlawful employment practice. (Gov. Code, § 12940, subd. (i) ["It is an unlawful employment practice . . . [F]or any person to . . . compel . . . the doing of any of the acts forbidden under this part, or to attempt to do so"].)

The Department further contends that plaintiff did not make it aware that he was complaining about being required to participate in unlawful discrimination. This contention is not supported by the record. Plaintiff's trial testimony on the issue—when

22

read in a light most favorable to the jury's finding, giving it the benefit of every reasonable inference and resolving all conflicts in favor of the finding—supported a reasonable inference that he testified before the Senate based on his concern about being required to segregate inmates by race, and the Department representatives who were present at the hearing were therefore aware of his concern.

### 4. *Retaliatory Intent*

The Department contends that there was insufficient evidence to support the jury's finding that the Department terminated plaintiff because it knew of his protected activities. According to the Department, the various employees involved in the two terminations had little or no knowledge about plaintiff's state Senate testimony or the comedy show. The Department further contends that the investigations leading up to the two terminations were initiated prior to plaintiff's protected activities and the evidence, "as a whole," shows that the Department had a good faith belief that plaintiff had engaged in misconduct.

#### a. First Termination

Substantial evidence supported the jury's conclusion that plaintiff's protected activities were a motivating reason for the first termination. Plaintiff's expert testified that internal affairs investigator Cortez had a conflict of interest and should have been removed from the investigation based on the complaint by plaintiff's wife. Nevertheless, the Department allowed Cortez to conduct the investigation. That evidence supported a reasonable inference of a retaliatory motive behind the investigation that led up to the first termination. That the Department would allow an investigator, who had the appearance of bias against plaintiff, to continue to investigate him suggested that the Department was intent on terminating plaintiff, even if his alleged misconduct did not warrant such action.

That inference of bias at the outset of the first investigation was bolstered by the fact that although Cortez knew or should have known from his interview of in-service

23

training officer Cardenas that plaintiff had not been trained in the medical policy, he was accused of violating, Cortez did not include that mitigating information in his final report as required. A reasonable juror could properly infer from that omission a retaliatory motive, i.e., the investigation was unfairly biased against plaintiff and in favor of termination. Similarly, the evidence of comments made by Associate Warden Downs at the May 2005 management meeting concerning management's desire to "nail" plaintiff in the pending adverse employment actions against him, supported an inference that certain managers or supervisors in the Department were intent on terminating plaintiff. And there was evidence that one of Downs's comments at that meeting alluded to a connection between the pending adverse employment actions and plaintiff's "attacks" on Warden Harrison.

Knowles's actions in making the final decision to terminate plaintiff the first time also supported a reasonable inference of retaliatory intent. First, Knowles knew about plaintiff's complaints about the comedy show, and there was circumstantial evidence from which the jury could have reasonably inferred that Knowles knew about plaintiff's Senate testimony, including evidence that Knowles regularly attended weekly meetings at which the *Johnson* case and the Department's racial segregation of inmates was discussed.[13] Moreover, Knowles admitted that when he decided to terminate plaintiff the first time based on the dishonesty allegation, Knowles was aware that the investigator's report did not specify the evidence in support of that allegation as required. Nevertheless, he terminated plaintiff on the assumption that evidence supported that allegation. In addition, there was evidence that Knowles modified the notice of adverse action to include two additional allegations of dishonesty, neither of which had been the subject of the first investigation or the first Skelly hearing. This evidence supported a reasonable

---

[13]    As noted, Knowles denied being aware of plaintiff's state Senate testimony, despite his attendance at the weekly meetings during which the *Johnson* case and the racial segregation issue were discussed. But even assuming that the jury believed Knowles's denial, it was undisputed that he was aware of plaintiff's activities in connection with the comedy show at the time he issued the notices of adverse action for both terminations.

24

inference of bias or animus against defendant, i.e., Knowles—as the decisionmaker for the first termination and with knowledge of plaintiff's protected activities—deviated from standard disciplinary procedures to ensure that plaintiff would be terminated.

### b. Second Termination

There was also substantial evidence to support the jury's finding that plaintiff's protected activities were a motivating factor in the Department's second termination of defendant. Plaintiff's expert testified that because the allegations underlying the second termination were based on his off-duty union activities, they were not the proper subject of an internal affairs investigation. That evidence, when combined with the evidence that internal affairs twice rejected the request to investigate on that basis, supported an inference that from the start of the second investigation, the termination was improperly motivated. That inference was also supported by the failure of internal affairs investigator Pettit to interview the three witnesses that plaintiff claimed would substantiate his denial of Stanback's allegation that plaintiff said, "I'll get you" during the telephone call about the Reno incident. Pettit also failed to obtain a complete copy of the minutes of the union meeting at which Stanback claimed plaintiff removed him from the board. Those complete minutes showed that, at the same meeting at which Stanback alleged he was removed from his union position, plaintiff reinstated him to that position. Pettit's failures in this regard supported a reasonable inference that the second investigation was biased and unfair and, therefore, designed to ensure that defendant would be terminated a second time.

In addition, as was the case with the first termination, Knowles—as the decisionmaker on the second termination and with knowledge of plaintiff's protected activities—added an allegation of dishonesty to the notice of adverse action that had not been included in the investigation report. Again, the addition of that allegation, when it had not been investigated by internal affairs, supported a reasonable inference that Knowles was attempting to ensure that plaintiff would be terminated a second time.

25

Finally, that the Department pursued the second termination *after defendant had already been terminated,* strongly suggested that the Department wanted to ensure plaintiff's termination. In light of the foregoing evidence concerning the second investigation and the Department's continued pursuit of the second termination even after the first termination, it was reasonable for the jury to conclude that the second termination was retaliatory.

As to both terminations, the Department raises several fact-based arguments, each of which, in effect, urges us to reweigh and reevaluate the evidence and make independent credibility determinations. But, under the applicable standard of review, we cannot retry the case on appeal. We therefore reject the Department's arguments concerning the evidence in support of the jury's finding of retaliation, as those arguments are grounded on the faulty premise that an appellate court can second-guess the trier of fact on appeal and substitute its judgment for that of the trier of fact. As explained above, under the substantial evidence standard of review, we are limited to a determination of whether there is *any substantial evidence*, contradicted or uncontradicted, that supports the verdict. As explained above, substantial evidence supported the jury's finding of retaliation.

## B. Instructional Error

### 1. Standard of Review

The Department's contention that the instructions on retaliation under FEHA were inadequate or erroneous is reviewed de novo and its contention that such erroneous instruction of the jury prejudiced its defense is reviewed to determine whether the improper instructions misled the jury and affected the outcome of the trial. "'"'The propriety of jury instructions is a question of law that we review de novo**.** [Citation.]" (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82 [89 Cal.Rptr.3d 34].) If an instruction is found to be erroneous, reversal is required only when "it appears probable that the improper instruction misled the jury and affected [its]

26

verdict. [Citation.]" (*Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1213 [31 Cal.Rptr.2d 776, 875 P.2d 1279].)' (*SCC Acquisitions, Inc. v. Central Pacific Bank* (2012) 207 Cal.App.4th 859, 863 [143 Cal.Rptr.3d 711].) In determining whether a jury was likely misled, the court must also evaluate "'(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." ([*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548,] 580-581 [34 Cal.Rptr.2d 607, 882 P.2d 298].)' (*Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1757 [52 Cal.Rptr.2d 620].)" (*Spriesterbach v. Holland* (2013) 215 Cal.App.4th 255, 263.)

### 2. *The Department's Proposed Jury Instructions*

The Department contends that the trial court erred when it refused to instruct the jury with the Department's proposed instruction nos. 7 (plaintiff must offer substantial evidence that intentional retaliation based on plaintiff's protected activities was "the motivating reason for the terminations"), 8 (employer can terminate if it honestly believed reasons and acted in good faith), 12 (definition of pretext), and 13 (employer can terminate if not discriminatory). According to the Department, the requested instructions "followed the law" and would have provided the jury with the essential elements of plaintiff's retaliation claim.

Although the Department summarily concludes that its four proposed instructions followed the law, it makes no effort on appeal to substantiate that conclusion. As to each proposed instruction, the Department fails to identify the case or statute that the instruction purportedly follows. Absent a reasoned discussion of the specific language of each instruction and the case law or statute that supports it, the Department fails at the outset to carry its burden on appeal to demonstrate instructional error. (See *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 685 ["An appellant must affirmatively demonstrate error through reasoned argument, citation to the appellate record, and discussion of legal authority. [Citations.] Accordingly, we cannot conclude that the refusal to give an instruction was error absent an adequate showing that the

27

proposed instruction was proper. [Citation.] . . . By failing to discuss the entire instruction and failing to explain why it was proper, [appellant] fails to carry its burden to demonstrate error"].)

In any event, the proposed instructions were argumentative (*People v. Battle* (2011) 198 Cal.App.4th 50, 85) and in some respects were not consistent with the law. For example, plaintiff's proposed special instruction no. 7 stated that plaintiff had the burden of showing that defendant's retaliation based on plaintiff's protected activity was "the motivating reason" for the terminations, i.e., plaintiff must prove causation under a "but for" standard. That is a misstatement of the law. (See *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 219 (*Harris*) [rejecting a "but for" standard for causation and endorsing an "a substantial factor" standard in a FEHA discrimination case].) Moreover, the instructions were not necessary, as the instructions given adequately covered the necessary points. (See *Bullock v. Philip Morris USA, Inc., supra,* 159 Cal.App.4th at p. 685.) And the Department does not specify why its proposed instructions were essential to clarify the claimed deficiencies in CACI No. 2505.

### 3. CACI No. 2505

In a related argument, the Department maintains that the instruction on retaliation given by the trial court—CACI No. 2505—was improper and misled the jury because it did not specify that plaintiff had the burden of showing causation under "a substantial factor" standard.[14] Plaintiff counters that, under the doctrine of invited error, the Department is prohibited from challenging CACI No. 2505 on appeal because the Department asked the trial court to give that instruction.

"'Under the doctrine of "invited error" a party cannot successfully take advantage of error committed by the court at his request. . . . In the present case, therefore, defendant cannot attack a verdict resulting from an erroneous instruction which it

---

[14]    In relevant part, CACI No. 2505 provided that plaintiff had the burden of proving, inter alia, that plaintiff's FEHA protected activity was "a motivating reason" for his terminations.

28

prompted. [Citations.]' (*Jentick v. Pacific Gas & Elec. Co.* (1941) 18 Cal.2d 117, 121 [114 P.2d 343].) 'Defendant may not avoid the application of the doctrine by asserting that the error was not deliberately or willfully induced. The good faith of defendant is immaterial. It is incumbent upon counsel to propose instructions that do not mislead a jury into bringing in an improper verdict.' (*Id.* at p. 122.)" (*Perlin v. Fountain View Management, Inc.* (2006) 163 Cal.App.4th 657, 667.)

The Department submitted to the trial court a list of proposed instructions, and included in that list was CACI No. 2505, i.e., the Department requested that the trial court instruct the jury on retaliation with that instruction. Therefore, the Department cannot challenge the propriety of that instruction on appeal.

In its reply brief, the Department argues that it is not barred by the doctrine of invited error from challenging CACI No. 2505 on appeal because the inadequacy of that instruction was not judicially recognized until after trial. Citing to *Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207 (*Joaquin*) and *Harris, supra,* 56 Cal.4th 203, the Department argues that it should be allowed to raise a new legal theory on appeal because those cases constitute new authorities on the adequacy of CACI No. 2505 that were decided after the entry of judgment and could not have been reasonably anticipated. (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1681.)

Although *Joaquin, supra,* 202 Cal.App.4th 1207, does criticize CACI No. 2505 for not specifying an "a substantial factor" standard for causation, that criticism is dicta. The court in *Joaquin* prefaced its entire discussion of the adequacy of CACI No. 2505 with the following observation. "The [appellant] has not raised the issue of instructional error [based on CACI No. 2505], and in light of our conclusion that there is no substantial evidence of retaliatory intent, we need not decide whether the jury was correctly instructed [with that instruction]." (*Id*. at p. 1229.) As for *Harris, supra,* 56 Cal.4th 203, which the Department raises for the first time in its reply, that case involved a racial discrimination claim under FEHA, not a retaliation claim, and it dealt with a different instruction—CACI No. 2500. (*Harris, supra,* 56 Cal.4th at p. 232.)

Thus, contrary to the Department's assertion, there is no new case authority expressly holding that CACI No. 2505 inadequately defines the elements of a retaliation claim under FEHA.  Therefore, it was incumbent on the Department to raise in the trial court the defects in CACI No. 2505 that it now asserts for the first time on appeal.  Because it did not object to or request modification of CACI No. 2505 at trial, and instead affirmatively relied upon that instruction, the Department cannot now challenge the adequacy of that instruction on appeal.

## C.    Damages

### 1.    Standard of Review

The Department's contentions concerning the propriety of awarding backpay and overtime as elements of the damages award calculation involve questions of law that are reviewed de novo, but the Department's challenge to the sufficiency of the evidence in support of the noneconomic component of the damages calculation is reviewed for substantial evidence.  "Whether a plaintiff 'is entitled to a particular measure of damages is a question of law subject to de novo review.  [Citations.]  The amount of damages, on the other hand, is a fact question . . . [and] an award of damages will not be disturbed if it is supported by substantial evidence.' (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 691 [21 Cal.Rptr.3d 732].)  We make '"[a]ll presumptions favor the trial court's ruling, which is entitled to great deference because the trial judge, having been present at trial, necessarily is more familiar with the evidence and is bound by the more demanding test of weighing conflicting evidence rather than our standard of review under the substantial evidence rule. . . . [W]e do not reassess the credibility of witnesses or reweigh the evidence.  To the contrary, we consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor.'" (*Kelly v. CB&I Constructors, Inc*. (2009) 179 Cal.App.4th 442, 452 [102 Cal.Rptr.3d 32], citations omitted.)  'The evidence is insufficient to support a damage award only when no reasonable interpretation of the record supports the figure.'

30

(*Toscano v. Greene Music, supra*, 124 Cal.App.4th at p. 691.)" (*Rony v. Costa* (2012) 210 Cal.App.4th 746, 753-754.)

        2.     *Backpay*

The Department argues that because the state personnel board already awarded plaintiff backpay, plaintiff was collaterally estopped from relitigating that issue at trial. Plaintiff responds by pointing out that the Department did not raise the issue in the trial court, a failure that he contends forfeits[15] the issue on appeal. In its reply brief, the Department maintains that it preserved the issue by arguing the collateral estoppel issue in a pretrial motion.

The issue of collateral estoppel is forfeited if it is not properly raised in the trial court. (*Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 89.) The Department's assertion that it raised the collateral estoppel issue in the trial court is unsupported by the record. The pretrial motion to which the Department refers can fairly be construed as raising two issues: the state personnel board had exclusive jurisdiction over the backpay issue based on plaintiff's election to proceed in that forum; and plaintiff was improperly forum shopping by attempting to litigate the backpay issue in two different fora.[16] The issue of collateral estoppel was not mentioned, much less explained, in that motion.

---

[15] Plaintiff uses the term waiver, but our Supreme Court has explained that, under these circumstances, the correct term is forfeit. "As the United States Supreme Court has clarified, the correct term is 'forfeiture' rather than 'waiver,' because the former term refers to a failure to object or to invoke a right, whereas the latter term conveys an express relinquishment of a right or privilege. (See, e.g., *United States v. Olano* (1993) 507 U.S. 725, 733 [123 L.Ed.2d 508, 113 S.Ct. 1770]; *In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2 [13 Cal.Rptr.3d 786, 90 P.3d 746] (*S.B.*); *People v. Simon* (2001) 25 Cal.4th 1082, 1097, fn. 9 [108 Cal.Rptr.2d 385, 25 P.3d 598] (*Simon*).) As a practical matter, the two terms on occasion have been used interchangeably. (*Simon*, at p. 1097, fn. 9; *People v. Saunders* (1993) 5 Cal.4th 580, 590, fn. 6 [20 Cal.Rptr.2d 638, 853 P.2d 1093] (*Saunders*).)" (*In re Sheena K.* (2007) 40 Cal.4th 875, 880, fn.1.).

[16] The memorandum of points and authorities in support of the motion in issue summarized the grounds for the motion as follows: "[The Department] files this

Because the Department failed to raise the collateral estoppel issue in the trial court, the issue has been forfeited.  "The forfeiture rule generally applies in all civil and criminal proceedings.  (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 400, pp. 458-459; 6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Reversible Error, § 37, pp. 497-500.)  The rule is designed to advance efficiency and deter gamesmanship.  As we explained in *People v. Simon*, [*supra*], 25 Cal.4th 1082 . . . :  "'"The purpose of the general doctrine of waiver [or forfeiture] is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had . . . ."'  [Citation.]  '"No procedural principle is more familiar to this Court than that a *constitutional* right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." . . .'  [Citation.]  [¶]  'The rationale for this rule was aptly explained in *Sommer v. Martin* (1921) 55 Cal.App. 603 at page 610 [204 P. 33] . . . :  "'In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them.  The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them.  If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal.'"  [Citation.]"  (Fn. omitted; [citations].)'  (*Simon, supra*, 25 Cal.4th at p. 1103, italics added.)"  (*Keener v. Jeld-Wen, Inc*. (2009) 46 Cal.4th 247, 264-265.)

---

memorandum of points and authorities in support of its argument that plaintiff elected the State Personnel Board ('SPB') as his exclusive forum in which to recover backpay and that he may not offer evidence of or request double recovery of backpay and benefits from the jury."  The two point headings in the memorandum provided:  "I.  [Plaintiff] Should Not Be Allowed To Ask To Be Compensated Twice For The Same Loss" and "II. Allowing [plaintiff] to Argue for Damages He Has Already Been Awarded Would Be a Waste of Scarce Judicial Resources."

### 3. *Overtime*

The Department contends that because the state personnel board does not award overtime compensation, plaintiff was barred from seeking such damages in the trial court. According to the Department, plaintiff's "clever forum shopping" should have not allowed him to obtain a recovery of overtime damages in the trial court after he had already elected his state personnel board remedy.

The Department cites no authority for its contention that because the state personnel board, as a matter of administrative policy, does not award overtime compensation, the trial court had no power to grant such an award, and we find no support for it in law or logic. The trial court had jurisdiction to determine plaintiff's retaliation claim under FEHA, including the jurisdiction to enter a damage award according to proof at trial. Under California law, once the jury determined that the Department was liable for retaliation under FEHA, plaintiff was entitled to establish the damages that reasonably flowed from the Department's statutory violation. (See *Cloud v. Casey* (1999) 76 Cal.App.4th 895, 910 ["the trier of fact must determine the amount and extent of backpay . . . necessary to make [the plaintiff] whole for the harm she suffered because of the corporations' gender discrimination"].) Because the Department does not contend that there was insufficient evidence to support the award of overtime compensation, the jury properly included such compensation as a component of the economic damage award.

### 4. *Noneconomic Damages*

The Department challenges the sufficiency of the evidence in support of the noneconomic damage award on several grounds. As to the award for past noneconomic damages, the Department contends that physical distress and psychological damages were unsupported by evidence and that plaintiff was not entitled to "litigation stress" damages. As to future pain and suffering damages, the Department contends that plaintiff offered no evidence to support such an award.

33

Each of the Department's arguments concerning the noneconomic damage award is an attempt to reweigh or reevaluate the evidence on appeal. Plaintiff's expert provided testimony that supported a reasonable inference that the stress from the terminations was a contributing cause of two serious medical conditions—diabetes and hypertension—and an aggravating factor as to two preexisting medical conditions—sleep apnea and a digestive tract disorder.

As for psychological damage, plaintiff's wife testified that he became a "different person" after the terminations, particularly around his children. She also testified that he was stressed by the terminations and, as a result, overate, developed high blood pressure, and was not sleeping at night, testimony from which the jury could have reasonable inferred that plaintiff suffered psychological distress that manifested itself in those physical symptoms.

As for litigation stress damages, plaintiff contends, and we agree, that the Department forfeited this issue by failing to raise it in the trial court. (*Keener v. Weld-Jen, Inc., supra,* 46 Cal.4th at p. 264-265.) Once plaintiff and his wife testified about stress arising from the litigation without objection, the Department was required to raise the issue with the trial court by, for example, asking the trial court to admonish the jury or by requesting a jury instruction that allowed the jury to differentiate between stress caused by the terminations and stress caused by the litigation. The Department's failure to do so deprived plaintiff of the opportunity to argue the issue in the trial court, and it prevented the trial court from providing guidance to the jury on the issue.

As to future pain and suffering, plaintiff testified that he was concerned about his reputation and, specifically, concerned that his firing had been the topic of a current events assignment in his daughter's class. He also testified that he was concerned about the effect the terminations would have on his career and concerned that he may not be able to promote in the future. That testimony constituted substantial evidence and supported a reasonable inference that plaintiff would experience future pain and suffering.

**DISPOSITION**

The judgment in favor of plaintiff is affirmed.  Plaintiff is awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, J.

We concur:

TURNER, P. J.

KUMAR, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.